MASSACHUSETTS SOBER HOUSING CORPORATION *vs.*
AUTOMATIC SPRINKLER APPEALS BOARD & another.[1]

No. 05-P-1089.

Middlesex. March 16, 2006. - July 12, 2006.

Present: PERRETTA, BROWN, & KAFKER, JJ.

*Administrative Law,* Agency, Decision, Judicial review. *Automatic Sprinkler Appeals Board. Words,* "Lodging house."

The conclusion of the Automatic Sprinkler Appeals Board that a group home
operated by a nonprofit organization constituted a "lodging or boarding
house" that was required to be protected with an adequate automatic
sprinkler system under G. L. c. 148, § 26H, was supported by substantial
evidence and contained no errors of law. [704-708]

CIVIL ACTION commenced in the Superior Court Department on
June 2, 2004.

A motion to dismiss was heard by *Julian T. Houston,* J.

*Bruce T. Macdonald* for the plaintiff.

*Annapurna Balakrishna,* Assistant Attorney General, for
Automatic Sprinkler Appeals Board.

*Cheryl Anne Watson* for city of Chelsea.

KAFKER, J. Massachusetts Sober Housing Corporation
(MSHC), a nonprofit organization that operates group housing
for recovering substance abusers, appeals from a judgment
ordering MSHC to install an automatic sprinkler system in its
Chelsea group home pursuant to G. L. c. 148, § 26H. This
statute, which applies to any city or town that has voted to ac-
cept its provisions, requires "every lodging house or boarding
house" to be protected with an adequate system of automatic
sprinklers. MSHC argues that its Chelsea property is not a
"lodging or boarding house" under G. L. c. 148, § 26H. The

---

[1]The city of Chelsea.

city of Chelsea, the Automatic Sprinkler Appeals Board and the Superior Court determined otherwise. We affirm.

*Background.* MSHC purchases single-family houses in residential neighborhoods and operates them as "sober houses," where men or women recovering from alcoholism and drug addiction may live together in a safe and affordable home environment. MSHC owns each property and leases it to an unincorporated association comprised of the house's residents. The lease is signed by an elected "house president" on behalf of the unincorporated association.

MSHC's properties are run under the Oxford House sober housing model, which has three governing principles. First, an Oxford House must be democratically operated, with officers elected from among the residents. Second, an Oxford House must be financially self-supporting, with each resident paying a weekly share of the property's expenses. Third, any resident of an Oxford House who uses alcohol or drugs must be expelled immediately. An Oxford House facility generally requires a sufficient number of residents both to serve as a peer support group for fellow residents in recovery and to carry the expenses of maintaining the property. Residents do not sign individual leases.

In October, 2003, MSHC purchased a house at 68 Hooper Street in Chelsea (sometimes referred to as Chelsea Oxford House), where it intended to establish an Oxford House for ten male military veterans in recovery. The project was funded in part by $275,000 in State and Federal grants, including $200,000 from the Department of Housing and Urban Development. After MSHC submitted an application to the city of Chelsea (city) for a building permit to renovate the property, city officials expressed concern that the Chelsea Oxford House would effectively function as a boarding house. Such a use was not permitted in the zoning district where the property was located.

MSHC requested a zoning accommodation pursuant to the Federal Fair Housing Amendments Act (Fair Housing Act), 42 U.S.C. § 3601 (1988). On December 9, 2003, MSHC and the city signed a memorandum of understanding whereby the city granted "a reasonable accommodation to [MSHC] as to the parking requirements of single family homes." The accom-

modation was "granted solely to the owner of 68 Hooper Street and does not apply to the property." MSHC agreed that the maximum number of residents in the house would be ten and that they would be veterans.[2] On December 15, 2003, the city's counsel sent MSHC a letter "to confirm that with a reasonable accommodation, the property located at 68 Hooper Street . . . complies with the City of Chelsea's Zoning Regulations."

Subsequently, on December 18, 2003, MSHC was notified by the city's department of inspectional services of its obligation under G. L. c. 148, § 26H, to install an automatic sprinkler system at 68 Hooper Street. Without a sprinkler system, no more than five people would be allowed to live in the house.[3] MSHC pursued an appeal of the city's order to the Automatic Sprinkler Appeals Board (board). After a hearing, the board found it undisputed that the house would be "occupied by six or more persons not within the second degree of kindred to the person conducting it," as § 26H required. Specifically, the board found that MSHC intended to establish a home for ten members of Oxford House.

The board found that the members of Oxford House rent the building from MSHC, which is the owner and landlord. Each week $115 is collected from each individual occupant and deposited into an Oxford House checking account. Oxford House then issues a monthly rent check to the landlord. The failure of any individual to pay the weekly rent may result, by vote of the others, in the eviction of the person who has failed to pay.

The board further found that the house at 68 Hooper Street has a first floor with two bedrooms and a second floor with five bedrooms, and that each bedroom has a locking door. The house contains three exits on the first floor and one stairway leading down from the second floor. There were several fire extinguishers, but no fire escapes. Smoking was not allowed in the house. The board determined that MSHC "indicated that it would cost approximately $25,000 to install a sprinkler system" that would satisfy the statutory requirements.

---

[2]They also could not be level three sex offenders.

[3]At oral argument, the court was informed that five Oxford House members were currently living at 68 Hooper Street.

The board emphasized that it "has consistently determined that the provisions of [G. L. c. 148, § 26H, apply] to all houses that fit the criteria stated in [the] statute." It further stated that the "purpose of the automatic sprinkler requirement is to protect public safety in the event of a fire. The statute applies to all such buildings, in a neutral manner, without regard to the . . . disability status of the building occupants." It concluded that "[a]lthough the statute requires a monetary expenditure related to the installation of a fire sprinkler [s]ystem, it clearly does not prohibit the intended use of the house by Oxford House" to accomplish its mission.

The board unanimously affirmed the sprinkler system requirement. MSHC then appealed the board's decision to the Superior Court pursuant to G. L. c. 30A, § 14(7). The Superior Court summarily affirmed the decision of the board and dismissed MSHC's complaint. A judgment ensued. MSHC appealed.

*Discussion.* General Laws c. 148, § 26H, inserted by St. 1986, c. 265, provides in relevant part:

> "In any city or town which accepts the provisions of this section,[4] every lodging house or boarding house shall be protected throughout with an adequate system of automatic sprinklers in accordance with the provisions of the state building code. . . .

> "For the purposes of this section 'lodging house' or 'boarding house' shall mean a house where lodgings are let to six or more persons not within the second degree of kindred to the person conducting it, but shall not include fraternity houses or dormitories, rest homes or group residences licensed or regulated by agencies of the commonwealth."

Under G. L. c. 30A, § 14(7), "[w]e shall uphold an agency's decision unless it is based on an error of law, unsupported by

---

[4]The city council of Chelsea adopted the provisions of G. L. c. 148, § 26H, on August 21, 1989. We take judicial notice of the fact that the city has an unfortunate history of great fires: on April 12, 1908, widespread fire left many thousands of people homeless in Chelsea, and in October of 1973, fires in Chelsea caused the area to be declared a Federal disaster.

substantial evidence, unwarranted by facts found on the record as submitted, arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." *Massachusetts Inst. of Technology* v. *Department of Pub. Utils.*, 425 Mass. 856, 867-868 (1997).

MSHC argues that 68 Hooper Street was not a lodging or boarding house under G. L. c. 148, § 26H. MSHC does not challenge the board's finding that "the house is occupied by six or more persons not within the second degree of kindred to the person conducting it." Nor does MSHC dispute that the Chelsea Oxford House is neither a fraternity, a dormitory, nor a rest home or group residence regulated by agencies of the Commonwealth. Finally, MSHC does not challenge the fact-finding regarding the living arrangements at 68 Hooper Street. Rather, it argues that the Oxford House model does not fit the precise statutory definition of "lodgings [to] let" or conform to the historical meaning of lodging or boarding house; therefore, it argues, the board committed an error of law when it so classi-fied the Chelsea Oxford House. MSHC further contends that an Oxford House is properly understood as a single-family home, and that this is how the city agreed to classify 68 Hooper Street when it entered into the memorandum of understanding grant-ing MSHC a reasonable zoning accommodation.[5] MSHC has not argued in this case that the Fair Housing Act, 42 U.S.C. § 3601, requires an accommodation for the Chelsea Oxford House under G. L. c. 148, § 26H.[6]

We discern no error in the board's conclusion that the living arrangements at 68 Hooper Street meet the definition of lodg-ings to let, particularly in the context of a statute designed to provide fire protection rather than define the legal status of a building's occupants. We have emphasized that "[l]egislation

---

[5]We note that the memorandum of understanding between the city and MSHC does not classify the Chelsea Oxford House as a single-family home, but merely provides a reasonable accommodation to the zoning laws that preclude boarding or lodging houses in the area.

[6]MSHC has alleged violations of the Fair Housing Act, 42 U.S.C. § 3601, in a separate suit filed in Federal District Court. We take judicial notice of the fact that in that case, the court denied MSHC's motion for a preliminary injunction to enjoin the city from enforcing G. L. c. 148, § 26H, as well as the fact that the court subsequently closed the case without prejudice or entry of judgment, pending the outcome of the instant proceedings.

on a matter of public safety should be construed so as to best effectuate its purpose." *AT&T* v. *Automatic Sprinkler Appeals Bd.*, 52 Mass. App. Ct. 11, 14 (2001), quoting from *1010 Memorial Drive Tenants Corp.* v. *Fire Chief of Cambridge*, 424 Mass. 661, 667 (1997) (Greaney, J., dissenting). See *285 Lynn Shore Drive Condominium Trust* v. *Automatic Sprinkler Appeals Bd.*, 47 Mass. App. Ct. 437, 442 (1999). The State building code, which is referenced in the statute, likewise instructs us to construe its terms "to secure its expressed intent, which is to insure public safety, health and welfare insofar as they are affected by . . . [concerns including] fire safety." 780 Code Mass. Regs. § 101.4 (1997).

We read the "lodgings [to] let" language and lodging house history differently from MSHC. Although MSHC finds legal significance in the statutory formulation of "lodgings [to] let," we see this language as nothing more than another definition of a lodging house. As the Supreme Judicial Court has noted, "[a] dictionary definition of 'lodging' is 'accommodation in a house, esp. in rooms for rent' and of 'lodging house,' 'a house in which lodgings are let.' " *Selvetti* v. *Building Inspector of Revere*, 353 Mass. 645, 646 (1968). See Sang Vo *vs.* Boston, U.S. Dist. Ct., No. 01-11338-RWZ, slip op. at 11-19, 21 (D. Mass. Sept. 22, 2003).

MSHC also attempts to draw fine legal distinctions between Oxford House residents and lodgers. Although the precise classification of Oxford House members as lodgers or leaseholders seems less significant from a fire protection perspective than the fact that a large number of unrelated people are living in close quarters in a noninstitutional, unregulated neighborhood house, we are not forced to choose between these considerations here. Contrast *1010 Memorial Drive Tenants Corp.* v. *Fire Chief of Cambridge*, 424 Mass. at 663 (court compelled to harmonize disparate legal status of condominiums and cooperatives under sprinkler statute).

The Oxford House members' legal status closely corresponds to the legal definition of a lodger. A lodger " 'acquires no property interest, or possession [in housing accommodations,] but only the right in accordance with the agreement to live in and occupy a room or other designated portion therein that still

remains in the owner's legal possession.' See Black's Law Dictionary 848 (5th ed. 1979). . . . [T]he critical distinguishing feature of a 'lodger' is his lack of interest in real property and his contractual relationship with the owner." *Hall* v. *Zoning Bd. of Appeals of Edgartown*, 28 Mass. App. Ct. 249, 254 (1990).

Each individual occupant of 68 Hooper Street pays $115 weekly in exchange for a bedroom and the right to share the rest of the house for as long as he lives by the Oxford House principles. Individual occupants have no property interest in the house, which is owned by MSHC. Although the lease is in the name of the Oxford House unincorporated association, and the individual occupants are members of Oxford House, the right of any occupant to remain in the house is subject to the house rules and the vote of the group.

MSHC also draws on the history of lodging houses in Massachusetts in an attempt to distinguish Oxford House. From a fire protection perspective, this history seems unhelpful to MSHC's argument. The most important common element from a fire safety perspective, large numbers of unrelated people living in an unregulated home in a residential neighborhood, seems to connect Oxford House to, rather than distinguish it from, its historic predecessors. See Wolfe, The Lodging-House Problem in Boston 5, 23, 26 (1906) (describing transient and tradesman-type lodging houses, their rental of separate rooms, their numerous residents, and their locations throughout the Boston area). See also Sang Vo *vs.* Boston, *supra* at 13-14 (reviewing history of lodging houses).

MSHC emphasizes the communal nature of the living arrangement in an Oxford House to distinguish 68 Hooper Street from a historic lodging or boarding house. See *White* v. *Maynard*, 111 Mass. 250, 253-255 (1872) (lodgers let "specified rooms" in a lodging house, but were not considered occupiers of the whole). See also Wolfe, *supra* at 5 (lodgers ate their meals outside the house). MSHC also contends that the Oxford House living arrangement is so closely analogous to single-family housing as to entitle the house to the legal status of a single family home. See generally *Commonwealth* v. *Jaffe*, 398 Mass. 50, 56-57 (1986) (outlining principles to be considered for drawing that analogy). We have, however, concluded that

the definition of a lodging house is broad enough to encompass communal living arrangements in which residents of a house can eat there and have access to all of the common areas. See *Hall* v. *Zoning Bd. of Appeals of Edgartown*, 28 Mass. App. Ct. at 253. "Typically, . . . occupancy in the manner contemplated . . . would [also] result in use of the property which is different from that which is ordinary and expected in a single family structure." *Id.* at 255.[7]

Although the Oxford House arrangement is somewhat sui generis, we discern no error in the board's analysis. From a fire safety perspective, 68 Hooper Street was properly deemed a lodging house. Like a traditional lodging or boarding house, it proposes to house a good number of unrelated men in a noninstitutional setting, in a residential neighborhood, in a large house with many bedrooms; the house at 68 Hooper Street also has only one stairway leading down from the second floor where many of those bedrooms are located, and no fire escapes. The increased risk of fire or injury associated with traditional lodging or boarding house arrangements would appear equally applicable to the Chelsea Oxford House despite the admirable communal emphasis of Oxford House life.

Finally, we owe deference to the board's reasonable interpretation of its own statute. See *AT&T* v. *Automatic Sprinkler Appeals Bd.*, 52 Mass. App. Ct. at 15; *Massachusetts Org. of State Engrs. & Scientists* v. *Labor Relations Commn.*, 389 Mass. 920, 924 (1983); *Board of Educ.* v. *School Comm. of Quincy*, 415 Mass. 240, 244 (1993). The Automatic Sprinkler Appeals Board is an agency with expertise and experience in the technical aspects of fire safety. *Worcester* v. *Labor Relations Commn.*, 438 Mass. 177, 180 (2002) (deference accorded to agency's "specialized knowledge and expertise, and to its interpretation of the applicable statutory provisions"). Its well-informed decision here is supported by substantial evidence and contains no errors of law. We therefore find no grounds for reversal.

*Judgment affirmed.*

---

[7]Single families are also in a different financial position. We note that MSHC received $275,000 in government grants for the 68 Hooper Street project.