NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11596

COMMONWEALTH  vs.  STEPHEN FOSTER.


Bristol.     November 7, 2014. - April 15, 2015.

Present: Gants, C.J., Cordy, Duffly, Lenk, & Hines, JJ.


Homicide.  Robbery.  Felony-Murder Rule.  Probable Cause.  Search
    and Seizure, Probable cause, Warrant, Affidavit.  Practice,
    Criminal, Capital case, Motion to suppress, Warrant,
    Affidavit, Duplicative convictions.



Indictments found and returned in the Superior Court
Department on December 11, 2009.

A pretrial motion to suppress evidence was heard by Renee P.
Dupuis, J., and the cases were tried before Robert J. Kane, J.


Dana Alan Curhan for the defendant.
Sebastian Jose Pacheco, Assistant District Attorney (David
B. Mark, Assistant District Attorney, with him) for the
Commonwealth.


DUFFLY, J.  In December, 2009, the defendant was indicted on

charges of murder in the first degree, armed robbery, receiving

stolen property, and carrying a firearm without a license, in the

shooting death of Hegazy Sayed.  In May, 2012, the defendant

filed a motion to suppress evidence seized pursuant to a search

warrant from his room in a "sober house." After an evidentiary hearing that took place in eight nonconsecutive days over the course of one year, the motion was denied, and the case proceeded to trial before a different judge of the Superior Court. The defendant's motion for a required finding of not guilty was denied. Before submitting the case to the jury, the judge dismissed the charges of carrying a firearm without a license and of receiving stolen property. A Superior Court jury found the defendant guilty of murder in the first degree on theories of deliberate premeditation and felony-murder, and also found the defendant guilty of armed robbery. The armed robbery conviction was dismissed subject to being reviewed for sentencing if the murder conviction were reversed on appeal.

On appeal, the defendant argues that the motion judge erred in denying his motion to suppress evidence seized from his residence pursuant to a search warrant, and all other evidence seized as a result of that initial search, because there was no probable cause that he was the perpetrator, and also because, even if there were evidence of his involvement in the robbery and killing, no nexus was established to show that evidence of the crimes would be found in his room. The defendant also requests that we exercise our authority to provide relief pursuant to G. L. c. 278, § 33E. Although the defendant concedes that the

evidence was sufficient to support his convictions, he argues that a reduction in the verdict would be more consonant with justice. We affirm the convictions,[1] and discern no reason to reduce the verdict of murder to a lesser degree of guilt or to grant a new trial.

Background. We summarize the facts the jury could have found, reserving certain facts for later discussion.

1. The shooting. At approximately 9:55 P.M. on October 25, 2009, Rosemary Alicea and Veronica Ponte stopped to purchase cigarettes at a convenience store and gasoline station in Taunton, where Alicea was a frequent customer. The attendant, the victim, came over to their vehicle, which was stopped near the front door. As was his usual practice, he assisted Alicea with purchases of items inside the store, while she remained in her vehicle.[2] Alicea requested two packages of a specific brand of cigarette, and the victim returned with only one package,

---

[1] The predicate offense for the felony-murder was the armed robbery. The judge dismissed the armed robbery conviction as duplicative, subject to reinstatement if the felony-murder conviction were reversed. Because the defendant was convicted of murder on theories of premeditation and felony-murder, the conviction of armed robbery should not have been dismissed. See Commonwealth v. Brum, 441 Mass. 199, 200 n.1 (2004) ("where, as here, the conviction of murder is based on a theory in addition to the theory of felony-murder, the conviction of the underlying felony stands"). See part 2 of the discussion section, infra.

[2] The victim usually carried a large amount of cash with him when while he was working. He kept a stack of bills folded in half in his pocket.

stating that it was the last one in the store.

A few minutes later, Neusa Marques, another regular customer at the convenience store, drove into the parking lot and stopped near the pumps. She saw a man wearing neon orange pants and a black sweater standing in the doorway to the store; he was standing with his back to the entrance, holding his arms straight out in front of him and appeared to have something in his hands. Marques did not see the regular attendant, who usually came out of the store and over to the pumps to assist customers. She thought immediately that something was wrong. She drove over the sidewalk rather than out the driveway, to get away from the parking lot as quickly as she could, and then "sped home" to her mother's house, which was about two or three minutes' drive from the convenience store.

Shortly after Marques left, two other regular customers, Kyle Swensen and Jared Kimball, drove into the convenience store parking lot. After they had been waiting at the pumps for the attendant for about ten minutes, Swensen went into the store and found the victim, whom he recognized, on the floor behind the counter; his eyes were open, his face was covered in blood, and he was lying in a pool of blood. He appeared to be dead. Swensen ran outside and telephoned 911, and then he and Kimball went back inside. They both thought that the victim was dead.

While Swensen and Kimball were waiting for emergency personnel, several other cars pulled into the parking lot.  A young woman who had arrived went into the store, took the victim's pulse, and walked out.

Emergency medical personnel arrived within minutes and began treating the victim.  He was not breathing but he had a faint pulse.  They transported the victim to the hospital, where he was pronounced dead.  An autopsy established that he died as a result of gunshot wounds to the right side of his head and to his face.

2.  The investigation.  Police officers investigating the shooting used a police dog to search a swampy, wooded area behind the convenience store.  At approximately 3 A.M. on October 26, 2009, five hours after the shooting, police found a number of items in the wooded area that appeared related to the shooting. These included a pair of white, size eleven Nike sneakers, one of which was stuck in some mud; a pair of nylon pants that were orange on the inside and blue on the outside; a green camouflage rifle bag; a firearm lock and instructions, a set of keys, and a container for the lock; a single .22 caliber bullet; and a Winchester Wildcat .22 caliber rifle.  There was also a loaded magazine containing live ammunition in one of the pants pockets. Police found a spent shell casing inside the store and a live round on the ground immediately outside the store.  Later testing

showed that the spent shell casing probably had been fired from the Winchester rifle, the weapon that had been used to kill the victim.[3] The weapon had been stolen from a Taunton home on October 19 or 22, 2009.[4]

The owner of the convenience store was contacted, examined the store, and determined that $1,041 was missing. He provided police with copies of the store's surveillance videotapes; the tapes showed a suspect entering the store holding a long object, and then running from the store, apparently moments after the shooting. Police were unable to obtain an image of the suspect's face due to the poor quality of the recording and the angle of the camera; they were able to determine that the suspect was a male wearing light-colored shoes and a dark sweatshirt or similar top of a dark color.

Approximately one hour after the shooting, at 11:07 P.M., emergency medical technicians (EMTs) -- one of whom had treated

---

[3] To fire the Winchester Wildcat .22 caliber rifle requires that the rifle be loaded manually with a magazine containing cartridges. A cartridge is seated in the chamber by manually sliding the bolt forward, pushing a round into the chamber. At that point, if the safety is off and the trigger is depressed, a single shot will fire. The weapon will not fire again until the manual bolt action is repeated.

[4] Four days before the shooting, a Taunton resident had reported to police that on October 19, 2009, a Winchester rifle, rifle bag, and firearm lock and container, with a key and instructions, had been taken from his home while he was away. Some rare coins, a silver ingot, and some jewelry also were taken.

the victim earlier that evening -- responded to a call from a rooming house on Broadway Avenue in Taunton. There they encountered the defendant, sitting on the front stairs waiting for them. Although the EMTs could see no obvious injuries, the defendant reported that he had been assaulted and had been hit on the side and back of his head. The defendant climbed into the back of the ambulance without assistance, and was transported to the hospital, which was approximately 200 feet from the rooming house. En route, the defendant told the EMTs that two men "beat him up" and that they had forced him to touch a gun. The EMTs asked the defendant if he had lost consciousness during the assault, and he replied that he had not been "knocked out" and had not lost consciousness at any point. The EMTs saw no signs of injury, trauma, or abrasions.[5] After they completed the transport to the hospital, one of the EMTs telephoned police.

The defendant told an emergency room doctor that he had been assaulted and hit in the head, and that he had lost consciousness and had been "out cold." The doctor observed no signs of trauma or injury, but ordered a computerized tomography (CAT) scan of the defendant's brain. The CAT scan showed no injury.

Police arrived at the hospital and spoke with the defendant.

---

[5] As a precautionary measure, the defendant was later discharged from the hospital with aftercare instructions for a closed-head injury.

He told them that, at approximately 8:30 P.M. that evening, he had been outside his house smoking when two men approached him. They asked him if he wanted to purchase a gun, and he asked to see it. One of the men handed him a camouflage duffle bag; he took the gun out of the bag and examined it. The gun looked like it was a BB gun and one of the metal parts was rusting. When the defendant told the men that he did not want to purchase the gun, they punched him in the side of the head, knocking him to the ground, and kicked him. They removed his white, size eleven Nike sneakers and blue nylon parachute pants, ripped his shirt, took the items of clothing, and left him in the bushes. In his statement to police at the hospital, the defendant described one of the men as between five feet, eight inches and five feet, eleven inches tall, and either Hispanic or African-American. He was wearing a camouflage jacket and dark pants. The second man was Caucasian, and shorter and heavier than the other. One of the men called the other man "Ray." The defendant thought he would be able to identify both men. He lost consciousness and was very cold when he woke up. He attempted to telephone his girl friend for help; when she did not answer, he called 911 for emergency medical help.

The officers suspected that the defendant had been involved in the shooting at the convenience store. In the early morning

hours of October 26, 2009, they had his hands and clothing tested for gunshot residue; the test results were negative. Later that day, police obtained a warrant to search the defendant's room in the boarding house. Under the defendant's mattress, they found jewelry, and the silver ingot and coins that had been reported stolen during the two break-ins at the house in Taunton on October 19 and 22, 2009.

Police subsequently learned that, at a few minutes after 10 P.M. on the night of the shooting, the defendant had gone to a pharmacy where he was a well-known customer. The pharmacy was very near the convenience store. Another customer and a clerk working at the pharmacy noticed that the defendant was not wearing shoes and that his socks were muddy. The defendant purchased a pair of slippers; when he paid for the purchase, he appeared to be holding a large amount of money.

Discussion. 1. Whether there was probable cause to issue a search warrant. The defendant claims that the evidence proffered in the search warrant affidavit was insufficient to establish probable cause that he had committed the robbery or the shooting, or that evidence related to those crimes would be found in his room. He argues that, at most, police had a "hunch" that he might have known something about the shooting, or have had some involvement in it, but that they lacked probable cause to believe

the defendant was the shooter.  He argues also that, even if there were probable cause to believe he had been involved in the shooting, officers had no reason to think that any evidence related to the shooting would be found in his room, in what he described as a "sober house," where he contends that residents' activities were closely monitored.

Under both the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, a search warrant may issue only upon a showing of probable cause.  See Commonwealth v. Valerio, 449 Mass. 562, 566 (2007).  A determination whether there was probable cause to issue a search warrant is restricted to an examination of the information within the four corners of the affidavit in support of the warrant, and the reasonable inferences to be drawn therefrom.  See Commonwealth v. O'Day, 440 Mass. 296, 297-298 (2003).  Where the location to be searched is a residence, probable cause exists only if there is specific information in the search warrant affidavit to show a "sufficient nexus" between the criminal activity and the residence.  Commonwealth v. Escalera, 462 Mass. 636, 642 (2012).  In order to satisfy the "nexus" requirement, "the affidavit 'must provide a substantial basis for concluding that evidence connected to the crime will be found on the specified premises.'"  Commonwealth v. Tapia, 463

Mass. 721, 726 (2012), quoting Commonwealth v. Donahue, 430 Mass. 710, 712 (2000). "Strong reason to suspect is not adequate." Commonwealth v. Upton, 394 Mass. 363, 370 (1985). Because a determination of probable cause is a conclusion of law, we review a search warrant affidavit de novo. Commonwealth v. Long, 454 Mass. 542, 554-555 (2009).

We do not agree that the warrant affidavit here was insufficient to establish probable cause. "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Commonwealth v. Kaupp, 453 Mass. 102, 111-112 (2009), quoting Draper v. United States, 358 U.S. 307, 313 (1959), quoting Brinegar v. United States, 338 U.S. 160, 175 (1949). The affidavit, written by a Taunton police detective, recites the events of the shooting and notes the items, including the rifle, green bag, white size eleven Nike sneakers, nylon pants, and the money recovered from the swampy area behind the convenience store. It details the defendant's statement to police, while he was being treated at the hospital for the purported assault, concerning the rifle in a green bag that he had handled after being shown it by the two assailants, and the white size eleven Nike sneakers, "parachute pants," and

other items of clothing the defendant reported had been stolen from him.   The defendant's improbable story concerning the very items that police found near the scene of the shooting, his telephone call to be transported to a hospital that was only a very brief walk from his house, his inconsistent claims concerning his loss of consciousness coupled with his apparent lack of injury, and his inconsistent statements to police, as set forth in the affidavit in support of the warrant, provided probable cause that the defendant had been involved in the shooting.

In support of his argument that it is "questionable" whether evidence related to the offenses at issue could have been brought into his rooming house, given "the supervision and peer monitoring that takes place in such residences," the defendant relies on the description of the "sober housing model" in Massachusetts Sober Housing Corp. v. Automatic Sprinkler Appeals Bd., 66 Mass. App. Ct. 701, 702 (2006).  The defendant does not explain how that description, of a single-family dwelling owned by the Massachusetts Sober Housing Corporation in another town, Oxford, relates to what police witnesses described as the "rooming house" where the defendant was living at the time of the shooting.  The warrant affidavit describes the building as a "three story dwelling consisting of several apartments" with a

"common area allowing entrance to all apartments" from the front door. The building has a large sign, approximately three feet by three feet, labeling it "Bristol Lodging Sober House." The defendant's apartment is noted as "apartment 4" on the first floor, "facing the side door" as one enters the front door.

Assuming that the building is a "sober house," nothing in the record describes its model of operation or any restrictions placed on its residents. Moreover, even if the Oxford sober housing model were applicable to the defendant's living situation, nothing in the description of the operation of such houses, or of the requirements that they be "democratically operated," and "financially self-supporting," see id., and that residents who use drugs or alcohol must be evicted, warrants an inference that a resident of such a house would be unable to keep items such as cash, clothing, ammunition, and weapons, the types of evidence sought here, in his room. Nor does the defendant's alternate argument that he only had been living in the building for a few weeks negate the inference that the defendant could have brought such evidence into his room. In particular, the warrant specifically included "bloody clothing." Because police knew that the defendant had been at his house after the shooting, he could have had the victim's blood on his clothes, his person, or any item he had with him at the scene and wore back to the

apartment. Although distinctive items of clothing and shoes had been found earlier near the scene, other items, such as the socks the defendant was seen wearing, without shoes, at the pharmacy immediately after the robbery, were not found in the swamp behind the convenience store.

2. Dismissal of armed robbery conviction. The judge stated that he dismissed the conviction of armed robbery because he believed he was required to do so given that the armed robbery was the predicate felony underlying the conviction of felony-murder; he stated also that the armed robbery conviction was subject to reinstatement if the conviction of felony-murder were reversed. Because the defendant was convicted of murder in the first degree on theories of both premeditation and felony-murder, the armed robbery conviction should not have been dismissed.

"The felony-murder rule 'imposes criminal liability for homicide on all participants in a certain common criminal enterprise if a death occurred in the course of that enterprise.'" Commonwealth v. Hanright, 466 Mass. 303, 307, (2013), quoting Commonwealth v. Matchett, 386 Mass. 492, 502 (1982). The felony-murder rule substitutes the intent to commit an inherently dangerous felony, punishable by imprisonment for life, for the "malice aforethought" required for murder; the rule is one of "constructive malice." See Commonwealth v. Judge, 420

Mass. 433, 438-439 (1995), citing Commonwealth v. Moran, 387 Mass. 644, 651 (1982), quoting Commonwealth v. Matchett, supra. To be liable for felony-murder, a defendant need only possess the intent necessary for the underlying felony. Commonwealth v. Hanright, supra.

Where a defendant is convicted of murder in the first degree on a theory of felony-murder alone, and where the only felony apart from the homicide is the predicate felony, the predicate felony merges with the homicide. In such a circumstance, the conviction of the predicate felony is duplicative as a lesser included offense of the homicide, and must be dismissed. See Commonwealth v. Gunter, 427 Mass. 259, 271-273 (1998). See also, e.g., Commonwealth v. Benitez, 464 Mass. 686, 697 (2013); Commonwealth v. Stokes, 460 Mass. 311, 316 & n.11 (2011); Commonwealth v. Bell, 460 Mass. 294, 299-300 (2011).

By contrast, where, as here, a defendant is convicted of murder in the first degree on a theory of felony-murder, and also is convicted of murder in the first degree on another theory, and where we affirm the convictions on both theories, the conviction of the predicate felony is not duplicative, and the felony conviction stands. See Commonwealth v. Bizanowicz, 459 Mass. 400, 402 (2011), citing Commonwealth v. Felder, 455 Mass. 359, 370-371 (2009); Commonwealth v. Brum, 441 Mass. 199, 200 n.1,

(2004).

3.  Relief pursuant to G. L. c. 278, § 33E.  Although he concedes that the evidence was sufficient to support a verdict of murder in the first degree, the defendant nonetheless requests that we exercise our authority under G. L. c. 278, § 33E, to reduce the verdict, arguing that a verdict of a lesser degree of guilt would be more consonant with justice.  In support of this argument, the defendant points to a rare autoimmune disorder from which he suffers that causes extensive nerve damage.  The defendant's condition was diagnosed in February, 2008, and resulted in him being hospitalized for six months, three of them in an induced coma, followed by eight months in a rehabilitation facility where he had to relearn how to walk.  The defendant contends, and the record appears to support, that this condition is ongoing and, as a result, he continues to suffer pain and numbness and has difficulty walking.  The defendant points also to a mental health condition that resulted in his commitment to a mental hospital for six months while he was awaiting trial, and to a childhood history of severe abuse and neglect by alcoholic parents and stepparents.  Relying on Commonwealth v. Rolon, 438 Mass. 808, 821 (2003), the defendant maintains that this combination of "physical and mental impairments" suggests that he may not have been "fully functional," and may not have acted with

malice at the time of the killing.

The defendant was committed to Bridgewater State Hospital pending trial after he made statements indicating that he intended to kill himself, and that he had been gathering the means by which he intended to do so. After evaluation, he was found to be suffering from severe depression, which his treatment providers believed would be ameliorated by individual and group therapy to provide him with better coping mechanisms in the face of stressful circumstances. Contrary to the defendant's contention that this admission raises "at least some reason to question" his mental state at the time of the killing, the defendant's medical evaluations state that he was suffering from situational depression due to his personal circumstances while incarcerated pending trial. The evaluations indicate that the defendant was, understandably, concerned about the possible sentence of life imprisonment he faced, and saddened by his inability to visit with his three year old son; the defendant stated that during earlier incarcerations he had been able to visit regularly with relatives, and missed that contact while awaiting his murder trial. These evaluations suggest a rational response to the defendant's circumstances, see Commonwealth v. Goudreau, 442 Mass. 341, 349-352 (2004), rather than the psychotic thought processes and illogical thinking the defendant

points to in Commonwealth v. Gould, 380 Mass. 672, 682 (1980). "Even an entirely rational defendant would be depressed, and might be suicidal, during a murder trial where the proof against him is substantial, and where he is facing life imprisonment with no possibility of parole." Commonwealth v. Laurore, 437 Mass. 65, 70-72, 79 (2002). See Commonwealth v. Russin, 420 Mass. 309, 316, 318 (1995). In any event, the defendant's mental state in response to his incarceration does not bear on his mental state at the time of the killing. The defendant did not claim diminished capacity at trial, nor does he argue that counsel was ineffective for having failed to do so.

In addition, and notwithstanding the defendant's contention, the "thrust of the evidence" does not support a determination that a lesser degree of guilt would be more appropriate. Contrast Commonwealth v. Cadwell, 374 Mass. 308, 318-319 (1978), quoting Commonwealth v. Jones, 366 Mass. 805, 808 (1975). The defendant concedes that the evidence was sufficient to support the verdict of murder in the first degree, and we conclude that the verdict is consonant with justice. The evidence supports the conclusion that, armed with a loaded rifle, the defendant went to the convenience store intending to rob it, and that he twice, deliberately and intentionally, shot the unarmed victim from the doorway of the store, within eight seconds of arriving, before

fleeing with a little more than $1,000 in cash.  He then concocted a far-fetched story of two unknown assailants to explain how clothing, ammunition, and a firearm used in the robbery, which could be connected to him, came to be discarded in the woods near the scene of the crime.  Nothing in the evidence suggests that the killing was the result of a "senseless brawl," Commonwealth v. Colleran, 452 Mass. 417, 431 (2008), quoting Commonwealth v. Ransom, 358 Mass. 580, 583 (1971), "sudden . . . combat," or a "minor controversy" that "explode[d] into" a killing, Commonwealth v. Colleran, supra, quoting Commonwealth v. Baker, 346 Mass. 107, 110, 119 (1963); that the victim was the first aggressor, Commonwealth v. Colleran, supra at 431-432, citing Commonwealth v. Baker, supra at 118; or provides any other indication of circumstances supporting spontaneity rather than premeditation, Commonwealth v. Williams, 364 Mass. 145, 151 (1973).  See Commonwealth v. Colleran, supra, and cases cited.

Having carefully reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, we discern no reason to reduce the verdict of murder in the first degree or to order a new trial.

Conclusion.  The conviction of murder in the first degree is affirmed.  Because the defendant was convicted of murder on theories of both premeditation and felony-murder, and because we

affirm on both theories, the conviction of armed robbery was not duplicative, and should not have been dismissed.  See Commonwealth v. Bizanowicz, supra at 402, citing Commonwealth v. Felder, supra at 370-371.  The judge's order dismissing that conviction is vacated, and the conviction is reinstated; we remand to the Superior Court for sentencing on the reinstated conviction.  See Commonwealth v. Wood, 469 Mass. 266, 269, 294 (2014).

So ordered.