COMMONWEALTH vs. JOHN BRUM.

Bristol. January 9, 2004. - March 11, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Homicide. Practice, Criminal,* Instructions to jury, Capital case. *Self-Defense.*

Where nothing in the evidence at the trial of an indictment charging murder in
   the first degree based on extreme atrocity or cruelty made a theory of
   reasonable provocation or sudden combat tenable, a defendant was not
   entitled to a manslaughter instruction, and therefore any error in the judge's
   instructions to the jury on voluntary manslaughter (as delineated in *Com-
   monwealth* v. *Acevedo,* 427 Mass. 714, 716-717 [1998]) did not create a
   substantial likelihood of a miscarriage of justice [205-207]; likewise,
   because the evidence did not warrant a self-defense instruction, any error
   in the judge's instruction on excessive force in self-defense could not have
   created a substantial likelihood of a miscarriage of justice [207-208].
At the trial of an indictment charging murder in the first degree, the
   prosecutor's elicitation of testimony from a State trooper witness on
   redirect examination regarding the defendant's refusal to speak to police
   after receiving Miranda warnings, coming as it did in response to defense
   counsel's suggestion during cross-examination of police impropriety, did
   not create a substantial likelihood of a miscarriage of justice. [208-210]

INDICTMENTS found and returned in the Superior Court Depart-
ment on August 27, 1997.

The cases were tried before *Raymond J. Brassard,* J.

*Charles K. Stephenson* for the defendant.

*M. Catherine Huddleson,* Special Assistant District Attorney,
for the Commonwealth.

IRELAND, J. A Bristol County jury convicted the defendant of
armed robbery as a joint venturer and of murder in the first
degree both as a principal and as a joint venturer, on the theories
of extreme atrocity or cruelty and felony-murder. On appeal, the
defendant argues (1) in his instructions to the jury on manslaugh-
ter on grounds of provocation and self-defense, the trial judge
committed an *Acevedo* error *(Commonwealth* v. *Acevedo,* 427
Mass. 714 [1998]) and therefore, the conviction of murder in

the first degree on the theory of extreme atrocity or cruelty should be vacated; (2) because the conviction of murder in the first degree on the theory of extreme atrocity or cruelty should be vacated, the conviction of armed robbery should be dismissed[1]; and (3) this court should exercise its power under G. L. c. 278, § 33E, to reduce the defendant's conviction of murder in the first degree on the theory of felony-murder to murder in the second degree. Because we determine that the defendant was not entitled to a manslaughter instruction, any *Acevedo* error did not create a substantial likelihood of a miscarriage of justice on the defendant's conviction of murder in the first degree based on extreme atrocity or cruelty. Accordingly, we affirm the defendant's conviction of armed robbery and of murder in the first degree on both theories. We also have reviewed the entire record, and decline to exercise our power pursuant to G. L. c. 278, § 33E.

*Facts.*

1. *The Commonwealth's case.* The jury were warranted in finding the following facts. In June, 1997, both the defendant and his identical twin brother, David,[2] were twenty-seven years old. Both lifted weights, drank heavily, and were addicted to heroin. They lived on the third floor of their grandmother's house in Fall River, approximately one block from the victim's sewing machine repair shop. The defendant and David worked occasionally for the victim, a seventy-nine year old man, lifting heavy machines and other items. When they worked for the victim, the pair would be paid in cash from money the victim was known to keep in his front pocket. In the weeks before the murder, the victim, though in good health, had lost a lot of weight and looked "awfully thin."

---

[1]Ordinarily, a separate conviction of an underlying felony (here, armed robbery) would be duplicative of the felony-murder conviction. However, where, as here, the conviction of murder is based on a theory in addition to the theory of felony-murder, the conviction of the underlying felony stands. *Commonwealth* v. *Pennellatore*, 392 Mass. 382, 390 (1984).

[2]David Brum was tried separately from the defendant and his convictions were affirmed after review by this court. See *Commonwealth* v. *Brum*, 438 Mass. 103 (2002).

We shall refer to the defendant's brothers by their first names to avoid confusion.

On June 13, 1997, David and the defendant were "strung out" and had no money. David called their stepfather and asked for money for groceries. Because he did not want them using money to buy beer, the stepfather took them grocery shopping. The stepfather did not notice anything unusual in the defendant's (or his brother's) behavior; the defendant did not appear to be under the influence of drugs or alcohol. After paying for the groceries, the stepfather drove the pair back to their apartment shortly after 12:30 P.M. The defendant and David went upstairs and put the groceries away. In the meantime, the stepfather visited with, and did a chore for, the defendant's grandmother.

While their stepfather was in the grandmother's house, the pair walked to the victim's shop, where the victim "buzzed" them in through the security door. David asked the victim for work and, when none was available, asked for a loan. The victim refused. An argument ensued. David grabbed the victim in a headlock. The defendant claimed that he noticed a hammer in the victim's hand and was afraid that the victim was going to hit David. Therefore, the defendant claimed, he took the hammer out of the victim's hand and hit him two or three times in the head and face causing the victim's glasses to fall off and the victim to fall to the floor.[3] When the victim fell to the floor, the defendant claimed that the victim's wallet came out of his pocket, and the pair picked it up.[4] The wallet contained $200, which they took. The defendant also took the hammer and wrapped it in paper towels he found in the shop.

The pair fled back to their apartment. The defendant got into the back seat of his stepfather's car and waited while David went inside to get their stepfather, who then drove them to the vicinity of the apartment of their brother Mark, which he shared with his girl friend, Sherry Schlee. During the drive, the stepfather did not notice anything unusual about the pair.

The defendant and David then went to Mark's apartment, but only Schlee was home. When Schlee saw the pair, they had a

---

[3]There was no evidence that the pair took weapons to the scene. The hammer and blade that were eventually discovered and tied to the murder (discussed *infra*) were identified as belonging to the victim.

[4]When he was found, the victim still had $600 on his person.

paper bag with them. At some point Schlee felt the bag and realized it contained a ball peen hammer. The defendant and David were "aggravated" and were bickering, calling each other "stupid" and pacing back and forth. Part of the conversation included the statement, "He's probably dead."

The defendant and David also asked Schlee to wash their clothes, including a pair of tennis shoes and a pair of boots. They told her that they had run through a swamp. As she prepared to wash the clothes, Schlee noticed a few small drops of blood on their two shirts and on the pair of tennis shoes.

Schlee kept pressing the pair about what they did and, after about one hour, David told her they had gotten into a fight because someone owed them money and that he had grabbed the person in a headlock and the defendant hit him over the head with a hammer. David then said that they were "just joking." The defendant did not say anything in response to David's recitation of events.[5] At some point, the pair also told Schlee that they did not want to go home because the police would probably "swarm the house."

After David said that they were only joking, he and the defendant were standing in the hallway and David was holding credit cards and a cut-up wallet. Schlee saw them wrap the bag with the hammer in other plastic bags. The pair took the bag with the hammer in it and their laundered clothes, and left the apartment for about twenty-five to thirty minutes, returning empty-handed. Schlee testified that the pair watched a basketball game that evening with Mark (who had come home) and stayed the night.

According to the defendant, he and David threw the bag with the hammer in it into a sewer near Mark and Schlee's apartment. They hid a bag containing their clothes in a closet of a house their brother Joseph was renovating.

The defendant stated that he and David used the money to buy a "bundle" of heroin and a twelve-pack of Budweiser

---

[5]David's statements were admitted in evidence as both adoptive admissions and as statements made by a joint venturer in the course and furtherance of the joint venture.

beer.[6] They also gave Schlee the money she needed to wash their clothes.

The victim was found the next day. Neighbors alerted police when they noticed that, uncharacteristically, the victim's automobile had been parked in front of the shop all night and that the shop's lights were on. An autopsy revealed that the victim suffered from extensive injuries, including a broken nose, numerous cuts and bruises, and defensive wounds. Each of three separate, but severe, injuries alone could have been the cause of death. First, the victim had skull fractures from being struck sixteen to twenty times on the head with a blunt object, such as a hammer.[7] He also had cuts on his wrists, so deep that the underlying blood vessels and tendons were severed, which were consistent with a blade that was found (discussed *infra*).[8] The third fatal injury was a fracture to one of the lower neck vertebra with hemorrhages to the lining of his airways, consistent with suffocation due to strangulation. According to the medical examiner, the victim was alive during the entire course of the attack and all the injuries were inflicted at about the same time. Most of the blood was on or near the floor by the victim's body. This evidence, coupled with the defendant's statement that the victim fell after he was struck, allowed the inference (as the defendant himself states) that most of the injuries causing blood loss occurred while the victim was prone.

Police picked up the defendant and David the day the victim was found on learning that they were casual employees of the victim. A neighbor also had seen the pair walking toward the victim's shop on the day of the murder. At that time, the

---

[6]At the defendant's trial, which took place before David's trial, Schlee stated that she never saw the defendant, David, or Mark ever use drugs, and she denied that Mark was a heroin dealer who sold heroin to the defendant and David. However, at David's trial Schlee changed her testimony, stating that Mark was a heroin dealer and that she was aware that the defendant and David used heroin on the evening of the murder. Her admitted perjury was the subject of the defendant's motion for a new trial, which was denied, and is not a subject of this appeal.

[7]The head of a golf club with blood on it was found at the scene. The medical examiner stated that it could have been the source of some of the victim's injuries.

[8]There was no evidence presented at trial concerning whether it was the defendant or David who inflicted the cuts on the victim's wrists.

defendant was given Miranda warnings and chose not to speak to police. The pair were initially dropped off by two detectives after this first interview but, based on information Schlee gave to investigating officers, they were arrested minutes later. Police recovered their clothes from the house and the bag from the sewer. The bag contained the hammer, a blade, and a crushed Budweiser beer can containing, inter alia, the victim's driver's license, credit cards and wallet, all of which had been cut up into pieces.

After his arrest, the defendant was given Miranda warnings and gave a statement to police[9] in which he described, inter alia, hitting the victim two or three times with the hammer, and the attempts he and David made to hide evidence.

2. *The defendant's case.* At trial, the defendant did not contest his responsibility for the victim's death and did not testify.

We view the evidence pertinent to the propriety of the judge's instructions on manslaughter on grounds of reasonable provocation and self-defense or defense of another in the light most favorable to the defendant. *Commonwealth* v. *Little*, 431 Mass. 782, 783 (2000). The defendant's version of events was admitted in evidence primarily through his statement to police. As recounted, on the day of the murder, the defendant and David were "strung out." They went to the victim's shop to ask for work or a loan. When the victim refused, the defendant stated that David got into an argument with the victim and put the victim in a headlock. The defendant noticed that the victim had a hammer in his hand and was afraid the victim was going to strike David. The defendant stated that he took the hammer out of the victim's hand and struck the victim two or three times, after which the victim fell to the floor. There was no evidence that the pair took weapons with them when they went to the victim's shop. See note 3, *supra*. The defendant claimed that the victim was alive, moving a little and moaning, when the pair left the shop.

In addition, the defendant also called three psychiatric experts to testify. In essence, the experts stated that, because of his

---

[9]The defendant agreed to sign the notes one of the detectives made during the statement. The defendant declined to have his statement audiotape recorded or videotape recorded, or to write it down himself.

childhood (he was physically abused by his father and his father died from wounds sustained in a beating), the defendant suffered from posttraumatic stress disorder, anxiety, depression, alcohol and heroin dependence, and impulsivity, making premeditation of the victim's murder impossible.[10]

*Discussion.*

1. Acevedo *issue.* At trial, the judge gave what was then a common jury instruction on voluntary manslaughter.[11] Both the defendant and the Commonwealth agree that the judge's instruction on voluntary manslaughter was an *Acevedo* error, *Commonwealth* v. *Acevedo*, 427 Mass. 714, 716-717 (1998) (manslaughter instruction unconstitutionally shifted burden of proof to defendant). Part of the instructions was, almost verbatim, the instruction the court considered in the *Acevedo* case. *Id.* at 716. As there was no objection to the instruction at trial, we review the instruction to see if it created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Lapage*, 435 Mass. 480, 481, 483 (2001).

The defendant argues that the evidence entitled him to a voluntary manslaughter instruction based on grounds of reasonable provocation and defense of another. We disagree.

a. *Reasonable provocation instruction.* Voluntary manslaughter is "a killing committed in 'a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat.' " *Commonwealth* v. *Garabedian*, 399 Mass. 304, 313 (1987), quoting *Commonwealth* v. *McLeod*, 394 Mass. 727, 738, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985). The evidence must allow a jury "to infer that a reasonable person would have become sufficiently provoked and that, in fact, the defendant was provoked." *Commonwealth* v. *Garabedian, supra*, quoting *Commonwealth* v. *McLeod, supra.* See *Commonwealth* v. *Parker*, 402 Mass. 333, 344 (1988), *S.C.*, 412 Mass. 353 (1992) and

---

[10]The judge did instruct the jury concerning mental impairment at various points in his instruction on the elements of murder and armed robbery.

[11]At trial, when defense counsel requested instructions on both voluntary and involuntary manslaughter, he said that he was not requesting an instruction on either self-defense or defense of another. However, the judge also gave an instruction on voluntary manslaughter due to excessive force used in self-defense.

420 Mass. 242 (1995), quoting *Commonwealth v. McLeod, supra* ("evidence must be sufficient to create a reasonable doubt in the minds of a rational jury that a defendant's actions were both objectively and subjectively reasonable"). Even evidence that "may not be of a character to inspire belief," *Commonwealth v. Garabedian, supra*, quoting *Commonwealth v. Schnopps*, 383 Mass. 178, 182 (1981), *S.C.*, 390 Mass. 722 (1984), may warrant an instruction on manslaughter, because judges are required to treat such evidence as if it were true. *Commonwealth v. Garabedian, supra*. However, it is error to give a manslaughter instruction without some supporting evidence of that crime. *Commonwealth v. Walden*, 380 Mass. 724, 727 (1980).

In this case, however, viewing the evidence in the light most favorable to the defendant, *Commonwealth v. Carlino*, 429 Mass. 692, 693 (1999), there is nothing that makes a theory of reasonable provocation or sudden combat tenable. In his statement to police, the defendant said that while David had the victim in a headlock, he saw the hammer in the victim's hand and was afraid that the victim was going to hit David. That was the extent of the evidence of any alleged sudden combat or reasonable provocation. There was no evidence that the victim actually hit either the defendant or David, nor any evidence that the victim even attempted to do so.[12] Even if the victim had attempted to strike the defendant, it would not, in these circumstances, rise to the level of reasonable provocation. See *Commonwealth v. Curtis*, 417 Mass. 619, 629 (1994) (victim's unsuccessful attempt to strike defendant with quart bottle full of liquor alone did not warrant manslaughter instruction where defendant confronted victim and landed first blow).

Moreover, the defendant stated that he took the hammer out

[12]Even if a victim brandishes a weapon or attacks a defendant, it does not necessarily create sudden combat or reasonable provocation. See, e.g., *Commonwealth v. Curtis*, 417 Mass. 619, 629 & n.6 (1994), and cases cited. See also *Commonwealth v. Roderick*, 429 Mass. 271, 278-279 (1999) (insufficient provocation where victim allegedly brandished machete against armed robber); *Commonwealth v. Brown*, 387 Mass. 220, 227 (1982) (victim's "chok-[ing]" defendant husband with shirt insufficient provocation to warrant manslaughter instruction); *Commonwealth v. Rembiszewski*, 363 Mass. 311, 321 (1973), *S.C.*, 391 Mass. 123 (1984) (victim's scratching defendant's face not provocation).

of the victim's hand, thereby negating any potential threat. See, e.g., *Commonwealth* v. *Walden, supra* at 728 (effect of eighty-four year old victim's blows passed when defendant knocked victim down several times). According to the defendant's own account of events, it was only after the victim was disarmed (and while the victim was being held in a headlock that broke his neck and asphyxiated him) that the defendant used the hammer to hit him. The defendant stated that it was then that the victim fell to the floor. See *Commonwealth* v. *Zukoski*, 370 Mass. 23, 29 (1976) (any threat from glass victim threw passed after defendant struck victim and knocked her to ground). There was no other provocation. Given these circumstances, as described by the defendant, coupled with the fact that the victim was a seventy-nine year old man and the defendant and David were twenty-seven year old weight lifters, "no reasonable jury could have accepted the suggestion that the defendants were provoked into the brutal killing." *Commonwealth* v. *Parker, supra* at 344 (sudden combat or reasonable provocation "untenable" where seventy-nine year old disabled victim struck two blows to face of one defendant).

b. *Self-defense instruction.* Although defense counsel explicitly stated that the defendant was not asking for an instruction on self-defense or defense of another, the judge gave an excessive force in self-defense instruction. In essence, the defendant argues that the self-defense instruction given by the judge also unconstitutionally shifted the burden of proof. There was no objection at trial to the judge's instruction. We need not analyze the alleged error because we conclude that the defendant was not entitled to such an instruction.

Viewed in the light most favorable to the defendant, *Commonwealth* v. *Carlino, supra,* evidence that David initiated the attack and had the victim in a headlock, and that the victim had a hammer in his hand, causing the defendant to be afraid that David would be struck, does not warrant instructions on either self-defense or defense of David.[13] Evidence that the seventy-nine year old victim was in a headlock with a hammer in his

---

[13]See *Commonwealth* v. *Johnson*, 412 Mass. 368, 372-373 (1992) (rule of justification for self-defense applies to defense of another); *Commonwealth* v. *Martin*, 369 Mass. 640, 649-650 (1976) (recognizing defense of another).

hand obviously is insufficient to show that the defendant had "reasonable grounds to believe, and actually did believe that he was in imminent danger of death or serious bodily harm." *Commonwealth* v. *Berry*, 431 Mass. 326, 335 (2000), quoting *Commonwealth* v. *Carrion*, 407 Mass. 263, 268 (1990). Therefore, the defendant did not have a right to any instruction on self-defense.

The defendant did not have the right to act in defense of David because David, as the attacker who did not withdraw from the affray, was not entitled to self-defense. See, e.g., *Commonwealth* v. *Fisher*, 433 Mass. 340, 352 (2001), quoting *Commonwealth* v. *Naylor*, 407 Mass. 333, 335 (1990) (right of self-defense not available to aggressor unless aggressor "withdraws in good faith" and "announces his intention to retire"); *Commonwealth* v. *Carrion, supra.*

Because the evidence did not warrant a self-defense instruction, any error in the instruction could not have created a substantial likelihood of a miscarriage of justice.

2. *Review under G. L. c. 278, § 33E.* We have reviewed the entire record pursuant to G. L. c. 278, § 33E, and see no reason to exercise our power and reduce the defendant's conviction to murder in the second degree. However, we address one issue not raised by the defendant.

At trial, the judge instructed the jury at several points that before they could consider the defendant's statement to police, they had to determine whether the Commonwealth proved that the statement was voluntary. During cross-examination of State Trooper Christopher Dolan, who was present at the police station when the defendant and David were first interviewed, defense counsel asked whether the defendant declined to speak to police. See *Doyle* v. *Ohio*, 426 U.S. 610 (1976). Dolan responded that he did learn that the defendant had declined to speak to police officers.[14] In her redirect examination, the

---

[14]The exchange was as follows:

DEFENSE COUNSEL: "Now, [the defendant] declined to speak with you at that occasion, did he not?"

TROOPER DOLAN: "I never spoke to [the defendant]."

DEFENSE COUNSEL: "But did he decline to speak with the police?"

TROOPER DOLAN: "I learned that he declined to speak to [the police officers]."

prosecutor raised the issue of the defendant's refusal to speak to police, to which defense counsel did not properly object.[15] In a series of leading questions the prosecutor, in essence, elicited from Trooper Dolan that the defendant had refused to speak to the police after receiving Miranda warnings, and that the trooper understood that it was unlawful and unconstitutional to attempt to interview the defendant after he invoked his Miranda rights.

A defendant's prearrest silence may not be used against him. *Commonwealth* v. *Peixoto*, 430 Mass. 654, 659 (2000). See *Doyle* v. *Ohio*, *supra* at 618-619 (1976). However, a prosecutor may respond to inferences of police impropriety raised by defense counsel on cross-examination. *Commonwealth* v. *Harabek*, 402 Mass. 105, 110 (1988), *S.C.*, 421 Mass. 1005 (1995). We conclude that the exchange between the prosecutor and Dolan did not create a substantial likelihood of a miscarriage of justice in light of the factors this court has identified as important in assessing the impact of a *Doyle* error.[16] *Commonwealth* v. *Mahdi*, 388 Mass. 679, 696-697 (1983).

Here, it was defense counsel who first introduced evidence that the defendant declined to speak to police at the first interview. The prosecutor properly responded to defense counsel's attempt to suggest police impropriety. The subject was never mentioned again. The prosecutor did not use the evidence against the defendant in her closing, and instead focused on the contents of the defendant's later statement to police and the defendant's mental state. Furthermore, the defense theory was that the defendant suffered from various mental impairments and could not have premeditated the

---

[15]See, e.g., *Commonwealth* v. *Fowler*, 431 Mass. 30, 40-41 & nn.17-19 (2000), and cases cited (*Doyle* error not preserved where objections by defense counsel failed to mention defendant's right to remain silent). See also *Doyle* v. *Ohio*, 426 U.S. 610 (1976).

[16]They are, "(1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions" (footnotes omitted). *Commonwealth* v. *Mahdi*, 388 Mass. 679, 696-697 & nn.16-20 (1983).

murder.[17] Finally, the statements from Schlee, coupled with the recovery of the defendant's clothes and the murder weapons, point overwhelmingly to the defendant's guilt in this brutal murder.

*Judgments affirmed.*

---

[17]We also note that the voluntariness issue pertained to the statement the defendant made to police after his arrest. As discussed, after the attempted interview, the defendant and his brother were dropped off by police, only to be picked up again and arrested minutes later.