NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12199


COMMONWEALTH vs. CLYDE HOWARD.



Middlesex.      December 8, 2017. - March 5, 2018.

Present: Gants, C.J., Gaziano, Lowy, & Cypher, JJ.


Homicide. Practice, Criminal, Instructions to jury, Lesser
    included offense, Capital case, Jury and jurors. Jury and
    Jurors. Evidence, Prior misconduct.



Indictment found and returned in the Superior Court
Department on March 19, 2009.

Following review by this court, 469 Mass. 721 (2014), the
case was tried before Brian A. Davis, J.


Sharon Dehmand for the defendant.
Jamie Michael Charles, Assistant District Attorney, for the
Commonwealth.


GAZIANO, J. On January 28, 2009, a heated argument between

the defendant and a coworker, Maurice Ricketts (victim),

escalated into a fatal shooting. At trial, there was no dispute

that the defendant had shot the victim; the issue before the

jury was the defendant's state of mind and whether the shooting had been in response to some form of reasonable provocation.

A Superior Court jury convicted the defendant of murder in the first degree on the theory of deliberate premeditation.[1] In this direct appeal from his conviction, the defendant challenges the judge's decision not to instruct the jury on the lesser included offense of voluntary manslaughter based on sudden combat; the adequacy of the instructions on reasonable provocation and lesser included offenses; the dismissal of an empanelled juror shortly before deliberations began; and the judge's decision to allow the introduction of prior bad act evidence.[2] The defendant also asks this court to exercise its extraordinary authority under G. L. c. 278, § 33E, and reduce the verdict to murder in the second degree or manslaughter. For the reasons that follow, we affirm the defendant's conviction and, after a thorough review of the entire trial record, decline to allow relief under G. L. c. 278, § 33E.

---

[1] This was the defendant's second trial. In 2014, we vacated the defendant's conviction of murder in the first degree because of the erroneous admission of a portion of his statement to police after he had invoked his right to remain silent. See Commonwealth v. Howard, 469 Mass. 721, 723 (2014).

[2] At his first trial, the defendant also was convicted of possession of a firearm without a license, possession of ammunition without a firearms identification card, and discharging a weapon within 500 feet of a building. Howard, 469 Mass. at 722 n.1. Those convictions are not before us.

1. Facts. We recite the facts the jury could have found, reserving other facts for our discussion of specific issues. In January, 2009, the defendant and the victim were coworkers at a pool supply distributor. The defendant, a janitor and handyman, had been employed there for over eleven years. In 2007, the distributor hired the victim to work as an "order puller"; this position involved working in the warehouse, assembling products to fill customer orders.

Over the course of the victim's employment, the defendant, who was sixty-five years old, and the victim, who was thirty-three, had been involved in a number of workplace altercations.[3] Approximately three months before the shooting, the defendant and the victim engaged in an altercation over the use of a forklift. The victim had been using a forklift inside the warehouse, and stopped using it momentarily. Seeing no one on the forklift, the defendant took it to use for one of his own tasks. The victim returned to the warehouse, saw the defendant operating the forklift, became enraged, and physically forced the defendant off the forklift. The defendant described it as the victim removing him from the forklift by grabbing him around the neck. Later that day, the defendant intentionally backed into the victim's automobile while it was parked in the

---

[3] The defendant stood five feet, eight inches tall and weighed 180 to 190 pounds. The victim was six feet, one inch tall and weighed approximately 230 pounds.

employees' lot.  As a result of these two incidents, a manager called both the defendant and the victim to his office and informed them that if there were any further incidents, they would be discharged.

On January 28, 2009, the defendant reported to work at 9 A.M., and began his ordinary routine.  A few minutes after 10 A.M., the defendant walked through the warehouse carrying a trash bag, headed toward a Dumpster located in a fenced-in yard.  A coworker, Michael Najarian, Jr., saw the defendant walking past and engaged in a brief, casual conversation with him.  Najarian later saw the defendant return to the warehouse from the yard.  As he was heading to the front pedestrian entrance of the building, the defendant walked past the victim, who was assembling an order near the front door.  The defendant stopped and turned around.  Najarian heard a "rather loud explosion of yelling."  Najarian looked up and saw the defendant and the victim standing face to face, no more than three or four feet apart, screaming at each other.  Najarian was unable to understand what they were saying, but headed towards them to break up the argument, so that neither would get in trouble with management.[4]

---

[4] A portion of the confrontation was recorded by a video surveillance camera in the warehouse.  The events visible on the recording are consistent with Najarian's testimony.  The footage shows the front of the warehouse from the inside, with a larger,

As Najarian approached from behind the victim, he saw the victim "reaching toward his right side, almost towards his belt." The victim then suddenly turned around and ran away from the defendant toward the back door of the warehouse and through the door to the back yard. With the victim no longer obstructing his view, Najarian was able to see that the defendant's "arm [was] raised with a gun [in] his hand at roughly a [forty-five]-degree angle, pointing towards the ground." The defendant fired a shot in the direction of the victim, and ran after him through the rear door of the warehouse into the fenced-in yard.

Najarian ran across the street to the office in order to alert other employees and telephone 911. The manager and the assistant manager immediately went to the warehouse building. As they approached the building, they heard two gunshots coming from the rear, and ran along the outside of the building toward the fenced-in yard. Peering through a gap in the fence, they

closed garage door and the smaller, pedestrian entrance. The defendant is seen entering the warehouse through the pedestrian door carrying a bag of trash. Someone who is at some points visible on camera is apparently driving a forklift and placing pallets of buckets of pool supplies near the door. A few minutes later, the defendant reappears in view, without the trash bag. He opens the pedestrian door and heads through the doorway, and then turns around and takes a step towards someone (the victim) who is approaching him at a brisk pace. They face each other from a few feet apart for at most a few seconds before the defendant pulls something from a pocket and extends his arm, as the other man turns and runs toward the back of the warehouse, out of the camera's view.

saw the defendant standing next to a Dumpster with his arm extended, holding something in his hand.  He fired two shots at a downward angle; both the manager and the assistant manager heard groaning sounds coming from behind the Dumpster.  After the second shot, the manager heard the muffled voice of the defendant saying "something to the extent, like, 'I got you' or 'I finally got you.'"  As the manager, who was unable to see the victim, was yelling to the defendant asking what he was doing, the defendant headed back toward the warehouse door, paused, turned around, walked back to the Dumpster, raised his arm, and fired another shot.

The manager and the assistant manager ran around the building to the front door of the warehouse.  They arrived just as the defendant was leaving.  The defendant pushed past them, saying, "I gotta get out of here.  The guy, the freaking guy, came at me with a hammer."  The defendant ran toward his white van and drove off at a high rate of speed.

A Cambridge police officer and emergency medical technicians found the victim wedged between the Dumpster and a stack of pallets.  He had two gunshot wounds to the head, and died upon arrival at a hospital.  One of the gunshots entered the left side of the victim's face without damaging his brain and was considered nonfatal.  The gunshot that produced the

second, fatal wound was fired from close range (within eighteen inches) into the back of the victim's head.

Later that day, at 4 P.M., a Boston police officer, alerted by a "be on the lookout" broadcast, spotted the defendant's white van parked near an intersection in a Boston neighborhood. The defendant was asleep in the driver's seat with a cellular telephone pressed to his ear. The officer removed the defendant, who was intoxicated, from the van. When asked if he was carrying a weapon, the defendant replied, "No, I threw it in the Charles River." At a Boston police station, the defendant made a series of unsolicited statements about the shooting, including the comment, "I'm not a bad guy. The guy was always fucking with me, you know, treating me like a woman, slapping me, you know. One time he told me to pull out my knife, he'll knock me the fuck out." Because of the defendant's obvious intoxication, he was not interviewed that night.

The next morning, a Cambridge detective and a State police trooper interviewed the defendant. The defendant told the police that he was afraid of the victim, whom he described as a "big guy" and an ex-convict who had served a lengthy prison sentence. The defendant reported that the victim frequently called him a "faggot" and would "stare [him] down." Recounting the forklift incident, the defendant told investigators that the victim "jacked [him] up" and threatened to "knock [him] out."

The defendant said that, for the previous six months, he had been carrying a gun in his jacket pocket because the victim "jacked [him] up that time, and [he] was running scared."

On the morning of the shooting, the victim had approached him "in a threatening manner, but in a subtle way" with a sledgehammer.  After that incident, the defendant encountered the victim while passing through the warehouse, they "had words," and he "just had enough."  "We made eye contact because I just got sick and tired of turning away and running like -- I just had enough. . . .  He said, 'Why you keep staring at me?'  And I said, 'No.  You are staring at me.  You're staring me down' . . . .  And that's when all hell break loose, and that's the end of everything that happened there."  According to the defendant, he told the victim to stop, and the victim paused, but then kept coming toward him.  The defendant, who was in a "daze," did not see the victim's hands and did not see if he was holding anything.[5]

At trial, the defendant presented expert testimony from a forensic psychologist, Dr. Charles Ewing.  Ewing diagnosed the defendant with posttraumatic stress disorder and opined that, as a result, the defendant was in fear for his life at the time

_____

[5] The defendant and the victim routinely carried box cutter knives in their pockets.  This was a common practice of employees at the company, who used the knives to cut open products strapped to pallets.  At the hospital, a police officer recovered a box cutter knife from the victim's clothing.

that he fired the first shot (that missed) toward the victim. Ewing testified that the absence of physical contact did not matter; the victim's hostile approach toward the defendant caused him to fear imminent bodily harm. After the first shot, the defendant went into a dissociative or "trance-like" state, and lacked the capacity to "think or reason clearly." In rebuttal, the Commonwealth called Dr. Alison Fife, a forensic psychiatrist, who testified that the defendant was not suffering from any mental illness on the day of the shooting.

The jury convicted the defendant of murder in the first degree on the theory of deliberate premeditation.

2. Discussion. a. Instruction on sudden combat. The defendant argues that a new trial is required because the judge denied his motion that the jury be instructed on the lesser included offense of voluntary manslaughter based on sudden combat. The defendant objected when the instruction was not given. We therefore review the judge's decision for prejudicial error. See Commonwealth v. Cruz, 445 Mass. 589, 591 (2005).

A manslaughter instruction is required if the evidence, considered in a light most favorable to the defendant, would permit a verdict of manslaughter rather than murder. See Commonwealth v. Nelson, 468 Mass. 1, 13 (2014); Commonwealth v. Colon, 449 Mass. 207, 220, cert. denied, 552 U.S. 1079 (2007). Manslaughter is a common-law crime that is defined in general

terms as an unlawful killing without malice.  Commonwealth v.
Webster, 5 Cush. 295, 308 (1850).  Voluntary manslaughter is a
killing committed in "a sudden transport of heat of passion or
heat of blood, upon reasonable provocation and without malice,
or upon sudden combat."  Commonwealth v. Burgess, 450 Mass. 422,
438 (2008), quoting Commonwealth v. Campbell, 352 Mass. 387, 397
(1967).[6]  See Commonwealth v. Smith, 460 Mass. 318, 325 (2011)
(reasonable provocation must meet subjective and objective
standards).

Over the Commonwealth's objection, and "in an abundance of
caution," the judge instructed the jury on voluntary
manslaughter based on reasonable provocation.  The defendant
contends that, because the mitigating circumstances of
reasonable provocation and sudden combat are indistinguishable,
it is error to instruct on reasonable provocation and not to
provide an instruction on sudden combat.

The mitigating circumstances of reasonable provocation and
sudden combat are so closely related that "much of our case law
treats them indistinguishably."  Commonwealth v. Camacho, 472
Mass. 587, 601 n.19 (2015).  There are differences, however,
between reasonable provocation and sudden combat.  Reasonable
provocation encompasses a wider range of circumstances likely to

_____

[6] A conviction of voluntary manslaughter also may be based
on the excessive use of force in self-defense.  Commonwealth v.
Espada, 450 Mass. 687, 694 (2008).

cause an individual to lose self-control in the heat of passion than does sudden combat. See Commonwealth v. Schnopps, 383 Mass. 178, 180-182 (1981) (reasonable provocation instruction warranted by victim's admission of adultery). "[S]udden combat is among those circumstances constituting reasonable provocation." Camacho, supra, quoting Commonwealth v. Walczak, 463 Mass. 808, 820 (2012) (Lenk, J., concurring). See Commonwealth v. Peters, 372 Mass. 319, 324 (1977) ("sudden combat is one of the events which may provoke the perturbation of mind that can end in a killing without malice"). Thus, it is more accurate to view sudden combat as a form of reasonable provocation. See Walczak, supra (Lenk, J., concurring).

Our decision in Webster, 5 Cush. at 308, provides guidance as to the type of altercation that may constitute sudden combat. "When two meet, not intending to quarrel, and angry words suddenly arise, and a conflict springs up in which blows are given on both sides, without much regard to who is the assailant, it is a mutual combat. And if no unfair advantage is taken in the outset, and the occasion is not sought for the purpose of gratifying malice, and one seizes a weapon and strikes a deadly blow, it is regarded as homicide in heat of blood . . . ." Id. Our jurisprudence has relied upon this definition for more than 150 years. See Commonwealth v. Rodriquez, 461 Mass. 100, 107 (2011); Commonwealth v. Clemente,

452 Mass. 295, 320-321 (2008), cert. denied, 555 U.S. 1181 (2009).

In Commonwealth v. Espada, 450 Mass. 687, 697 (2008), quoting Commonwealth v. Pasteur, 66 Mass. App. Ct. 812, 822 (2006), we clarified that, "for sudden combat to be the basis of a voluntary manslaughter instruction the 'victim . . . must attack the defendant or at least strike a blow against the defendant.'"  See Commonwealth v. Gonzalez, 465 Mass. 672, 685-686 (2013) (no evidence of sudden combat where defendant was unable to demonstrate overt act by victim amounting to attack or exchange of blows); Rodriquez, 461 Mass. at 107 (no sudden combat where victim walked "hastily" toward defendant, without any accompanying physical gestures indicating intended violence); Commonwealth v. Brum, 441 Mass. 199, 206 (2004) (no sudden combat where victim, who was armed with hammer, did not actually strike defendant or his brother or attempt to do so).[7]

---

[7] Depending upon the particular facts presented, physical contact between a defendant and a victim does not necessarily support an instruction on reasonable provocation or sudden combat.  See Commonwealth v. Curtis, 417 Mass. 619, 629 (1994); Commonwealth v. Walden, 380 Mass. 724, 727 (1980). "There must be evidence that would warrant a reasonable doubt that something happened which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, and that what happened actually did produce such a state of mind in the defendant." Walden, supra at 728.  See Commonwealth v. Ruiz, 442 Mass. 826, 839 (2004) (no sudden combat where victim slapped and jumped on defendant because "conduct presented no threat of serious harm to him");

Given the absence of evidence of combat in this case, the judge properly denied the defendant's request for an instruction on sudden combat. Najarian, the sole eyewitness to the altercation, observed the defendant and the victim yelling at each other while they stood three or four feet apart. In the defendant's version of the encounter, he and the victim made eye contact inside the warehouse, and the victim advanced toward him. They began yelling at each other, the defendant felt threatened, and he decided that he had had enough. "That's when all hell broke loose." The defendant told police that the victim had not touched him at the point when the defendant pulled his handgun out of his pocket. The surveillance footage is consistent with these statements.

b. Instruction on reasonable provocation. The defendant asks this court to reverse his conviction because the judge's instruction on reasonable provocation included a statement that threatening gestures are not sufficient to constitute reasonable provocation. In his brief, the defendant argues that the victim's movement "towards his pocket," where the victim

---

Commonwealth v. Brum, 441 Mass. 199, 206 n.12 (2004) ("Even if a victim brandishes a weapon or attacks a defendant, it does not necessarily create sudden combat or reasonable provocation"); Commonwealth v. Rembiszewski, 363 Mass. 311, 321 (1973) ("[I]t is an extravagant suggestion that scratches [inflicted by the victim on the defendant's face] could serve as provocation for a malice-free but ferocious attack by the defendant with a deadly instrument").

concealed a box cutter knife, "started a chain of events which led to the shooting." The defendant contends that the judge's erroneous instruction negated his only defense and eliminated any possibility that the jury would find him guilty of manslaughter. Because the defendant did not object to the judge's instruction on reasonable provocation, we review his claim to determine whether there was a substantial likelihood of a miscarriage of justice. Commonwealth v. Serino, 436 Mass. 408, 419 (2002).[8]

The judge's instruction on reasonable provocation provided:

"When we say heat of passion, that includes the state of mind of passion, anger, fear, fright and nervous excitement. Reasonable provocation is provocation by the person killed that would likely to produce such a state of passion, anger, fear, fright or nervous excitement in a reasonable person as would overwhelm his capacity for reflection or restraint and actually did produce such a state of mind in the defendant.

"So the reasonable provocation must be such that a reasonable person would have become incapable of reflection or restraint and would not have cooled off by the time of the killing, and that the defendant himself was so provoked and did not cool off at the time of the killing. In addition, there must be a causal connection between the provocation, the heat of passion and the killing. The killing must occur after the provocation and before there is sufficient time for the emotion to cool, and must be the result of the state of mind induced by the provocation

---

[8] The Commonwealth argues that the evidence, viewed in a light most favorable to the defendant, did not support an instruction on reasonable provocation. See Commonwealth v. Clemente, 452 Mass. 295, 321 (2008), cert. denied, 555 U.S. 1181 (2009). Having concluded that the judge's instructions were not erroneous, we do not reach the issue whether the defendant was entitled to such an instruction.

rather than by a preexisting intent to kill or grievous injure, or an intent to kill formed after the capacity for reflection or restraint has returned.

"So now what constitutes reasonable provocation? Mere words or threatening gestures, no matter how insulting or abusive, do not by themselves constitute reasonable provocation. Physical contact, even a single blow, may amount to reasonable provocation. Whether the contact is sufficient will depend on whether a reasonable person under similar circumstances would have been provoked to act out of emotion rather than reasoned reflection."

"The heat of passion also must be sudden. That is, the killing must have occurred before a reasonable person would have regained control of his emotions."

As the defendant points out, the term "threating gestures" is not included in our model jury instructions on homicide. See Model Jury Instructions on Homicide 66 (2013) ("Mere words, no matter how insulting or abusive, do not by themselves constitute reasonable provocation"). Although we have urged trial judges to adhere to the model jury instructions, "judges are not required to deliver their instructions in any particular form of words." Commonwealth v. Sinnott, 399 Mass. 863, 878 (1987).

We have stated that threatening gestures, standing alone, may not necessarily constitute reasonable provocation. In Commonwealth v. Jefferson, 416 Mass. 258, 263-264 (1993), and Commonwealth v. Weaver, 395 Mass. 307, 312 (1985), we upheld the use of an instruction on reasonable provocation, which provided that "mere insulting words and threatening gestures, alone, with nothing else do not constitute adequate provocation to reduce a

killing from murder to manslaughter."  See Commonwealth v. Dyer, 460 Mass. 728, 747 (2011), cert. denied, 566 U.S. 1026 (2012) (noting that instruction providing that "mere insulting words or threatening gestures" were insufficient to establish type of provocation necessary to reduce murder to manslaughter was accurate); Commonwealth v. Niemic, 427 Mass. 718, 723 n.3 (1998) (instruction that "[m]ere insulting words and threatening gestures alone with nothing else do not constitute adequate provocation to reduce a killing from murder to manslaughter" is correct statement of law).

We take this opportunity to note, however, that judges should proceed with caution when deviating from our model jury instructions on homicide and instructing the jury that threatening gestures may not constitute provocation. Ordinarily, words and accompanying gestures, even if insulting or hostile, are not sufficient to provoke a reasonable person to lose self-control in the heat of passion.  See Commonwealth v. Vatcher, 438 Mass. 584, 588-589 (2003).  On the other hand, in certain circumstances, words and gestures may combine to convey information that would constitute adequate provocation and would render an unlawful killing voluntary manslaughter.  See, e.g., Commonwealth v. Tu Trinh, 458 Mass. 776, 783 (2011) (court examines whether evidence of actions, or actions combined with words, were sufficient to trigger deadly response).

In Commonwealth v. Little, 431 Mass. 782, 786-787 (2000), for example, we examined the victim's words and actions to determine whether the defendant was entitled to an instruction on provocation. The evidence included that the victim had approached the defendant, yelling, "I'll fuck you up," and had continued to advance toward the defendant despite having been warned that the defendant was armed. Id. at 785. The defendant believed that the victim, who had been known to carry a handgun in the past, was in possession of a gun. Id. at 783-784. The defendant testified at trial that the victim "made a motion like he was going for his hip" and the defendant believed the victim had reached toward his back in order to draw his gun. Id. at 785. Based on this evidence, we held that the victim's "hostile behavior" permitted the jury to find that the defendant "shot his handgun in the heat of passion, provoked by the above circumstances." Id. at 786-787. See Commonwealth v. Fortini, 68 Mass. App. Ct. 701, 702-703, 706 (2007) (instruction on reasonable provocation warranted from evidence of unknown assailant's intrusion onto defendant's porch in middle of night, lunging at defendant, and reaching for defendant's shotgun).

We conclude that, in light of the facts presented here, the judge's reasonable provocation instruction was not erroneous because none of the circumstances that would permit a threatening gesture to rise to the level of provocation was

present.  There was no evidence in the Commonwealth's case-in-chief that the victim made a threatening gesture, and the defendant did not introduce any evidence that he, in fact, believed that the victim had been reaching for a knife.  See Commonwealth v. Groome, 435 Mass. 201, 220 (2001) (there must be evidence from which jury could determine that defendant was provoked).  See also Camacho, 472 Mass. at 602.  Indeed, in his interview with police, the defendant did not mention the victim's gesture toward his belt, which his coworker described, and did not express a belief that the victim had been reaching for a knife or any other weapon in his pocket.  To the contrary, the defendant said that he had not seen anything the victim did with his hands, as the defendant had been in a "daze" or had "tunnel vision," and that, after an exchange of words, "all hell broke loose because [the defendant] just got sick and tired of it."  Not only did the defendant indicate no fear of the victim, he commented that, after he fired the first shot, the victim was urging him on to continue shooting, which enraged the defendant.

The defendant's description of the events to police, that was played for the jury at trial, was as follows:

> The defendant:  "You know, it's a funny thing you should say that because he was -- I couldn't understand.  I know he might have been hit before once and he was still saying, 'Come on, come on.'  And I'm saying -- at that time -- now hindsight now I can look at that, but --"
>
> First interviewer:  "Yeah."

The defendant:  "See, that's what he meant -- I couldn't understand --"

First interviewer:  "So the whole time he's egging you on?"

The defendant:  "Yeah, I couldn't understand that."

. . .

Second interviewer:  "He's out back there, right, could he have just gone like through the gate and get the hell out of there or what the hell -- why is he still there?  Could he have left the property?"

First interviewer:  "How come he didn't go out the side door?  Why didn't he run out there or how come he didn't go out the side door that you went to the van?"

The defendant:  "Because I got in a stinking rage."

. . .

Second interviewer:  "If he was such . . . in fear or anything, how come he didn't try to go out the side door that you said you left to go to your van?  Why did he run out back?"

The defendant:  "Because he would have to go through me."

First interviewer:  "What about out back because -- is there a gate out back that he could have just took off from?"

The defendant:  "That gate was locked."

First interviewer:  "Oh, was it?  Was he reaching for anything?  Did he have a gun or anything on him that he was --"

The defendant:  "I had tunnel vision.  I wasn't seeing anything like that.  I was --"

First interviewer:  "But he still said, hey, you know, come on, come on, still egging you on, huh?"

The defendant:  "I couldn't understand that, and that made me --"

Accordingly, the defendant has not shown any error in the judge's instruction on reasonable provocation.[9]

c.  Instruction on lesser included offenses.  The defendant also challenges the fact that the judge's charge did not include a "soft transition" instruction on lesser included offenses.  He argues that the lack of a "soft transition" instruction necessarily resulted in the deliberations proceeding under an "acquittal first" structure.  Thus, he argues, the jury were precluded from considering the lesser included offense of voluntary manslaughter unless and until they found the defendant not guilty of murder in the first degree.  Because the defendant did not object to this instruction at trial, we review any error to determine whether it created a substantial likelihood of a miscarriage of justice.  See Serino, 436 Mass. at 419.[10]

---

[9] The defendant contends also that, in his closing argument, the prosecutor misstated the law of reasonable provocation and the evidence.  This argument is unavailing.  The prosecutor properly referred to the objective component of provocation, and argued reasonable inferences drawn from the facts.

[10] The judge did not instruct the jury, in accordance with our model jury instructions on homicide, that "[i]f you find the defendant not guilty of murder in the first degree or murder in the second degree, you shall consider whether the Commonwealth has proved the defendant guilty beyond a reasonable doubt of the lesser offense of voluntary manslaughter . . . ."  Model Jury Instructions on Homicide 36 (2013).

In an acquittal first (or "hard transition") jurisdiction, the jury are required first to deliberate regarding the most serious offense charged; they are precluded from considering a lesser included offense "unless and until they unanimously find the defendant not guilty of the greater charge." Commonwealth v. Figueroa, 468 Mass. 204, 224 (2014). By contrast, juries in a soft transition jurisdiction have "free rein to conduct their deliberations as they see fit." Id., quoting Commonwealth v. Roth, 437 Mass. 777, 794 n.14 (2002). The jury must be permitted to consider a lesser included offense prior to reaching a unanimous decision on the defendant's guilt or innocence of the greater offense. Figueroa, supra at 224-225. Massachusetts is, as the defendant points out, a soft transition jurisdiction. Id.

We discern no error in the judge's instructions as to lesser included offenses. Contrary to the defendant's claim, the judge specifically instructed the jury to consider manslaughter based on reasonable provocation prior to reaching a decision on whether the defendant had committed murder in the first degree. In instructing the jury on the theories of murder in the first degree by deliberate premeditation and by extreme atrocity or cruelty, the judge explained that the Commonwealth was required to prove beyond a reasonable doubt the absence of mitigating circumstances. He instructed,

> "The law recognizes that in certain circumstances, which we refer to as mitigating circumstances, the crime is a lesser offense than it would have been in the absence of mitigating circumstances.  Now a killing that would otherwise be murder in the first [or] second degree is reduced to the lesser offense of voluntary manslaughter if the defendant killed someone under mitigating circumstances."

The judge went on to inform the jury that "[i]n this case the mitigating circumstance that you must consider is what is referred to in the law as heat of passion on a reasonable provocation."

In addition, the judge began his instructions on voluntary manslaughter by telling the jurors that, "[l]ike murder in the second degree, voluntary manslaughter is a lesser-included offense with the charge of murder in the first degree."  He then recapped his prior instructions, explaining, "So to prove the defendant guilty of murder in the first or second degree, the Commonwealth is required to prove beyond a reasonable doubt that there are no mitigating circumstances that reduce the defendant's culpability.  A mitigating circumstance is a circumstance that reduces the seriousness of the offense in the eyes of the law."

Viewed in their entirety, the instructions correctly informed the jury of their obligation to consider evidence of reasonable provocation before convicting the defendant of murder in the first degree.

d.  <u>Dismissal of empanelled juror</u>.  The defendant challenges the judge's decision to dismiss an empanelled juror toward the end of the trial, because of a three-page note that she had sent the judge after the defendant's expert testified.

During empanelment, a juror reported that she had been the victim of a sexual assault.  After receiving input from both counsel, the judge asked the juror a follow-up question:

> <u>Q</u>.:  "Was there anything about any treatment that you may have received, or support that you may have received, or anything of that nature that would affect in any way your ability to listen to any psychiatrist, psychological testimony in this case, with an open mind?"
>
> <u>A</u>.:  "I don't think so.  I mean, it wasn't an actual rape. It was like an assault.  So it wasn't -- I mean, it was not a great experience.  But . . . ."

The judge found the juror indifferent, and she was seated after neither party exercised a peremptory challenge.

On the day before closing arguments, the judge informed the attorneys that he had just been handed a three-page note from the juror.  In the note, the juror referenced the prior assault, and stated, "[I]t made sense to me what [Ewing] was saying about a dissociative state, because to a smaller extent I guess I have experienced that."  The juror indicated that she could relate to the expert's description of the defendant being on edge and "walking on egg shells."  The juror assured the judge that she could "put all of that aside and just look at the evidence that was presented, but I wanted to be forthright that this

experience did make me think about my own experience and to inquire if that disqualifies me from participating in deliberations."  After a hearing, the judge dismissed the juror over the defendant's objection.  The judge instructed the remaining jurors that he had dismissed the juror for a reason "entirely personal to that juror and [that] had nothing to do whatsoever with the merits of this matter."

A trial judge is vested with the discretion to discharge a juror prior to deliberations "in the best interests of justice." G. L. c. 234A, § 39.  See Commonwealth v. Stokes, 440 Mass. 741, 751 (2004); Commonwealth v. Rock, 429 Mass. 609, 613-614 (1999). Here, the judge reasoned that the juror, after hearing testimony from the defendant's expert witness, might have self-diagnosed herself or had realized that she might have suffered from dissociative and posttraumatic stress disorders as a result of her own assault.

Given the juror's disclosure that she had been influenced by the defendant's expert's testimony, and had realized that she might have experienced the same psychiatric symptoms as the expert testified that the defendant had suffered, we conclude that the judge acted well within his statutory authority to excuse the nondeliberating juror in the interests of justice.

e.  Prior bad act evidence.  The defendant argues that the judge abused his discretion in allowing the prosecutor to

introduce evidence that, at some time in the past, the defendant had brought a gun to work. A coworker, Shane Nixon, testified on direct examination that, at some point before the victim's employment, he observed the defendant "with something that appeared to be a gun in the area of" the company's premises. On cross-examination, Nixon clarified that what he had seen had been the handle of what appeared to be a handgun wrapped in a dirty white rag in the defendant's vehicle. Nixon acknowledged that he had never seen the defendant carrying a gun on his person.

The judge allowed the Commonwealth to introduce this evidence in order to impeach the defendant's statement that he had started bringing a gun to work because he was afraid of the victim. The judge immediately instructed the jury that the evidence was admissible "to the extent that you find it relevant solely on the issue of whether the defendant acted intentionally and not because of some mistake or accident or innocent reason, or as to whether it shows a common plan or scheme or pattern of conduct, or with respect to the defendant's state of mind, motive, intent, opportunity, preparation, plan or knowledge, with respect to the identity of the defendant as the perpetrator of the crime charged." In his final charge, the judge repeated this instruction.

Evidence of a defendant's prior or subsequent bad acts is not admissible to show "bad character or criminal propensity" (citation omitted). Commonwealth v. Lally, 473 Mass. 693, 712 (2016). It generally is admissible for another purpose such as to establish a defendant's "common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive." Commonwealth v. Helfant, 398 Mass. 214, 224 (1986). Evidence of prior bad acts also may be introduced to rebut "the defendant's contentions made in the course of trial" (quotations omitted). Commonwealth v. Anestal, 463 Mass. 655, 665 (2012), quoting Commonwealth v. Magraw, 426 Mass. 589, 595 (1998). See Mass. G. Evid. § 404(b)(2) (2017). The Commonwealth is required to demonstrate that the probative value of the evidence is not outweighed by the risk of unfair prejudice to the defendant. Commonwealth v. Crayton, 470 Mass. 228, 249 (2014). We review questions of admissibility, probative value, and unfair prejudice under an abuse of discretion standard. Id. at 252.

In his statement to police, the defendant said that he had begun bringing a small handgun to work approximately six months before the incident, because of his fear of the victim following the incident with the forklift: "Since he [the victim] jacked me up that time, and I was running scared." Evidence that Nixon had seen the handle of a gun in the defendant's vehicle prior to the victim's employment was admissible to rebut this claim.

Although the judge did not abuse his discretion in allowing Nixon to testify about his observations of the defendant's vehicle at some point before the victim began working at the company, we agree with the defendant's argument that the limiting instructions focused improperly on the defendant's state of mind. The judge should have instructed the jury in accordance with the reason that he had allowed the evidence to be admitted: that it was relevant to rebut the defendant's statement that he started bringing a gun to work because he was afraid of the victim.

Nonetheless, the error in the limiting instruction was harmless. See Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994) (error harmless if reviewing court is "sure that the error did not influence the jury, or had but a slight effect"). The focus of the trial was on the defendant's state of mind at the time of the shooting. The testimony about a rag-wrapped object that might have been in the defendant's vehicle, at some point before the victim began working at the company, received minimal attention at trial. Commonwealth v. McGee, 467 Mass. 141, 158 (2014). Nixon's testimony concerning the issue was brief, and the prosecutor did not mention it in his closing argument. See Commonwealth v. Rutherford, 476 Mass. 639, 649 (2017).

f.  <u>Review under G. L. c. 278, § 33E</u>.  We have carefully reviewed the entire record, pursuant to our duty under G. L. c. 278, § 33E, and find no reason to set aside the verdict or reduce the degree of guilt.

<u>Judgment affirmed</u>.