SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. DARA POUM

 
 Docket:
 SJC-13443
 
 
 Dates:
 March 7, 2025 - July 9, 2025
 
 
 Present:
 Budd, C.J., Kafker, Wendlandt, Georges, & Wolohojian, JJ.
 
 
 County:
 Middlesex
 

 
 Keywords:
 Homicide. Felony-Murder Rule. Armed Home Invasion. Firearms. Evidence, Argument by prosecutor. Practice, Criminal, Argument by prosecutor, Opening statement, Instructions to jury, Sentence, Assistance of counsel, Duplicative convictions, Capital case. License.
 
 

             Indictments found and returned in the Superior Court Department on December 10, 2014.
            The cases were tried before Robert L. Ullmann, J.
            Andrew S. Crouch for the defendant.
            Chia Chi Lee, Assistant District Attorney, for the Commonwealth.
            WOLOHOJIAN, J.  In the early morning hours of Sunday, August 10, 2014, the defendant entered an apartment on Andrews Street in Lowell and shot and killed two of its occupants.  After a jury trial, the defendant was convicted of felony-murder, G. L. c. 265, § 1; armed home invasion, G. L. c. 265, § 18C; and possession of a firearm without a license, G. L. c. 269, § 10 (a).  The defendant raises several arguments in this direct appeal.  First, he argues that the jury should not have been instructed that, with respect to felony-murder, the Commonwealth was not required to prove the absence of mitigating circumstances, specifically reasonable provocation by sudden combat.  Second, he asserts that the prosecutor impermissibly appealed to emotion in his opening statement and closing argument.  Third, the defendant contends that the judge prejudged the sentences prior to the sentencing hearing, and that defense counsel was ineffective for failing to present any mitigating information at sentencing.  Fourth, the defendant argues, and the Commonwealth concedes, that his conviction of armed home invasion must be vacated as duplicative because it was the predicate felony for the felony-murder conviction.  Fifth, the defendant argues, and the Commonwealth acknowledges, that the firearm conviction must be vacated because the jury were not instructed that the Commonwealth bore the burden to prove beyond a reasonable doubt that he did not possess a firearms license, and the Commonwealth failed to introduce any evidence on the issue.  Finally, the defendant asks that we exercise our authority under G. L. c. 278, § 33E, to reduce the verdicts of murder in the first degree to manslaughter or murder in the second degree, or to grant other appropriate relief.  
            We vacate and set aside, without need for further discussion, the defendant's conviction of armed home invasion because it is duplicative of the felony-murder conviction for which it served as the predicate felony.  See Commonwealth v. Alcequiecz, 465 Mass. 557, 568 (2013), quoting Commonwealth v. Rasmusen, 444 Mass. 657, 666 (2005) ("When a murder conviction is based on a felony-murder theory, the underlying felony, whatever it may be, is always a lesser included offense and the conviction for that felony, in addition to the conviction of murder, is duplicative").  Also, without further discussion, we vacate the defendant's conviction of unlawful possession of a firearm because the jury were not instructed that the Commonwealth bore the burden to prove lack of licensure and presented no evidence on that point; we remand for further proceedings on the firearm charge.[1]  See Commonwealth v. Guardado, 493 Mass. 1, 12 (2023), cert. denied, 144 S. Ct. 2683 (2024).  For the reasons explained below, we affirm the two felony-murder convictions.
            Background.  We briefly summarize the facts as the jury could have found them, reserving additional details for our discussion of the issues raised on appeal.  
            On Saturday, August 9, 2014, the defendant went to his girlfriend's family's house located on Andrews Street in Lowell, where he spent the afternoon and evening "hanging out," drinking, and eating.  During the early hours of Sunday morning, while this gathering was still underway, the defendant's girlfriend's sister saw the defendant holding a firearm in one hand and a clip in the other.  She snatched the clip from him, saw that it contained a bullet, and then attempted to retain it despite his repeated demands for its return.  Ultimately, the girlfriend's sister acquiesced and returned the clip to the defendant.  The defendant then left the party for twenty minutes.  When he returned, his shirt was spotted with blood, his hair was disheveled, his forehead had a scratch, and he was breathing hard and sweating.  When the girlfriend asked about this state of affairs, the defendant said that he had gotten into an argument with the neighbors after they had called him names and swore at him.
            In fact, the defendant had gone two doors down Andrews Street, where he entered a second-floor apartment through its back door at approximately 1:45 A.M. and herded its three adult occupants into a small bathroom where he shot and killed Keith and Joseph Callahan at close range.[2]  There was no known connection between the defendant and his victims.
            The defendant's girlfriend confronted him after seeing news of the murders a few days later, including a police sketch resembling the defendant.  He admitted to her that he had shot the gun in the neighbors' apartment, that he had buried the gun in her father's backyard, and that he had hidden his sneakers in her mother's closet.  The defendant said, however, that he did not know who or what he may have hit, and that he hoped no one had been hurt.  Nonetheless, the defendant predicted that he would be sent to jail for a long time.  The police located the gun (a semiautomatic pistol) and the sneakers where the defendant said he had hidden them.  Ballistics testing showed that the spent projectiles recovered from Keith's body and from the bathroom where the killings took place came from the semiautomatic pistol the defendant buried in the garden.  Testing determined that the deoxyribonucleic acid profile of the blood found on the defendant's sneaker matched that of Keith.
            The defendant was indicted of two counts of murder in the first degree:  one count pertained to Keith, who died at the scene, and the other pertained to Joseph, who died while being transported to a hospital.  The defendant was also indicted for armed home invasion, with Joseph's girlfriend, Jessica Kelly, named as the victim.  Finally, the defendant was charged with unlawful possession of a firearm.
            The murder charges were submitted to the jury on theories of deliberate premeditation and felony-murder.  As to the first theory, the defense asked the jury to find that although the gun was in his hand, the defendant, who was intoxicated, did not pull the trigger and that the gun somehow went off during a struggle in the bathroom with the victims.  As to the latter, defense counsel argued that the defendant had come to the apartment to conduct a "small" drug transaction and, therefore, that the Commonwealth had failed to prove beyond a reasonable doubt that the defendant had not been invited to the apartment.  This argument also served as the defense to the armed home invasion charge.  The jury were also instructed on murder in the second degree and voluntary manslaughter.  The defendant did not contest the firearm charge, and in closing argument, defense counsel told the jury that the defendant acknowledged that he was responsible for his unlicensed possession of the firearm.  
            The jury found the defendant guilty of felony-murder, but not guilty of murder by deliberate premeditation.  The jury also found the defendant guilty of armed home invasion and of unlawful possession of a firearm.  This appeal followed.
            Discussion.  1.  Sudden combat.  With respect to murder in the first degree by deliberate premeditation and murder in the second degree, the judge instructed the jury that the Commonwealth bore the burden to prove the absence of mitigating circumstances, in this case heat of passion induced by sudden combat.  By contrast, over the defendant's objection, the judge instructed the jury that the Commonwealth was not required to prove the absence of mitigating circumstances with respect to felony-murder.  The judge drew the jury's attention to this difference between felony-murder, on the one hand, and murder in the first degree by deliberate premeditation and murder in the second degree, on the other, by instructing:
"To convict of felony murder, the Commonwealth does not have to prove the absence of m[itig]ating circumstances.  As I said earlier, to convict the defendant . . . of murder with premeditation, that is an element, but the absence of mitigating circumstances is not an element of felony murder."  
Because the defendant timely preserved his objection to this instruction and asked that a sudden combat instruction be given with respect to felony-murder, we review to determine whether there was error and, if so, whether it was prejudicial.  Commonwealth v. Kennedy, 478 Mass. 804, 809 (2018).  
            The judge's decision to not give a sudden combat instruction with respect to felony-murder appears to have been influenced, at least in part, by an explanatory note contained in the 2018 Model Jury Instructions on Homicide.  The 2018 explanatory note did not foreclose judges from instructing on mitigating circumstances in connection with felony-murder, but stated that it was unlikely the evidence would merit such an instruction if the killing took place during the commission of a life felony.  Model Jury Instructions on Homicide 61 (2018) ("We can imagine few circumstances where an instruction regarding the absence of mitigating circumstances would be warranted by the evidence where the killing occurred during the alleged commission of a felony punishable by life imprisonment").  Such was the case here, as the underlying felony for which the defendant was charged was armed home invasion, which is punishable by life in prison.  See G. L. c. 265, § 18C.[3]  
            The defendant argues that the 2018 explanatory note is at odds with Commonwealth v. Brown, 477 Mass. 805 (2017), cert. denied, 586 U.S. 826 (2018), which eliminated felony-murder as an independent theory of liability for murder, limited felony-murder to its statutory role as an aggravating element of murder, and prospectively required that the Commonwealth prove one of the three forms of malice to sustain a conviction of felony-murder.  Id. at 807-808.  In the defendant's view, because the Commonwealth, post Brown, is required to prove actual malice to sustain a felony-murder conviction, "mitigating circumstances [are] once again relevant," and he was therefore entitled to an instruction on sudden combat with respect to felony-murder similar to the instruction the judge gave with respect to murder in the first degree by deliberate premeditation and murder in the second degree.  The defendant does not challenge the judge's instructions in any other respect, and we note that the judge's felony-murder instructions comported with Brown in that they instructed the jury on the Commonwealth's burden to prove one of the three forms of malice and also comported with the model jury instructions on homicide adopted after Brown.
            A defendant is not entitled to an instruction on mitigating circumstances unless the evidence warrants one.  Commonwealth v. Walden, 380 Mass. 724, 727 (1980).  Thus, the defendant's claim of error depends on whether the evidence in this case warranted an instruction on mitigating circumstances, particularly, provocation by sudden combat.  To evaluate that question, we now expand upon our initial cursory recitation of the facts, taking the evidence in the light most favorable to the defendant.  See Commonwealth v. Howard, 479 Mass. 52, 57 (2018); Commonwealth v. Rodriquez, 461 Mass. 100, 106 (2011).  
            Keith and Joseph were brothers who lived in a second-floor apartment on Andrews Street.  Joseph's girlfriend, Jessica Kelly, also lived there, as did Joseph's and Jessica's two young children:  a six week old and a thirteen month old, Joseph Jr., whom the family called "Joe-Joe."[4]  Keith's three sons (aged six, eleven, and fifteen) also stayed at the apartment every other weekend.  All three adults and five children were in the apartment on the night of the murders.
            On that night, Keith and Joseph had invited some friends over to "hangout" and play foosball.  The guests, as well as Keith and Joseph, used the back porch of the apartment to smoke and drink.  The back porch was accessed by a door in the kitchen (back door), but the back door was used only to access the back porch; it was not used by the residents or their guests to enter or leave the apartment.  Jessica and all but one of the children were in their bedrooms by 12:30 A.M.  Before she went to bed, Jessica checked to make sure the back door was locked.  By approximately 1:30 A.M., all the guests had left the apartment via the front door.
            At approximately 1:45 A.M., Keith's eleven year old son, R.C., heard the back door of the apartment open, and then saw the defendant (whom he did not recognize) standing in the hall at the doorway to Keith's bedroom.  Keith asked the defendant, "Who the fuck are you?" but R.C. could not make out the defendant's response.  R.C. saw Keith try to walk the defendant toward the kitchen.  Instead, the defendant took Keith to the bathroom where Joseph was showering.  R.C. next saw the defendant holding a gun and looking into Joe-Joe's bedroom.  The defendant then went into Jessica's bedroom, woke her by striking her head with the gun, and instructed her at gunpoint to go to the bathroom, where she found Keith and Joseph "lined up" against the wall.  Joseph was wearing only a towel.
            Once the three adults had been marshalled into the close confines of the small bathroom, the defendant, who appeared confused and uncertain as to where he was, repeatedly asked, "Where the fat bitch was at" and tried to leave the bathroom, presumably to look for that person.  The gun remained in the defendant's hand.  Keith and Joseph repeatedly attempted to dissuade the defendant from leaving the bathroom by saying that no one else was in the apartment except for the children.  Ultimately, after again asking where "the fat bitch" was, the defendant turned to leave the bathroom and Keith lunged for the gun, pinning the defendant to the wall.  Jessica fled.  A struggle then ensued between the defendant and Keith and Joseph, both of whom were taller and heavier than the defendant.[5]  Two shots were fired back to back and, after a pause during which Joseph said, "Please don't shoot," a third shot followed.  One bullet struck Keith above the collarbone and a second in the lower abdomen; Joseph was struck once in the chest.  The defendant then fled the apartment through the back door, taking the gun with him.
            Sudden combat is a form of reasonable provocation, Howard, 479 Mass. at 58, and "one of the events which may provoke the perturbation of mind that can end in a killing without malice," Commonwealth v. Peters, 372 Mass. 319, 324 (1977).  Since 1850, we have turned to the following description of the type of altercation that may constitute sudden combat:
"When two meet, not intending to quarrel, and angry words suddenly arise, and a conflict springs up in which blows are given on both sides, without much regard to who is the assailant, it is a mutual combat.  And if no unfair advantage is taken in the outset, and the occasion is not sought for the purpose of gratifying malice, and one seizes a weapon and strikes a deadly blow, it is regarded as homicide in heat of blood . . . ."
Commonwealth v. Webster, 5 Cush. 295, 308 (1850).  See Howard, 479 Mass. at 58; Rodriquez, 461 Mass. at 107; Commonwealth v. Clemente, 452 Mass. 295, 320-321 (2008), cert. denied, 555 U.S. 1181 (2009).  
            Generally, to warrant a sudden combat instruction the "victim . . . must attack the defendant or at least strike a blow against the defendant."  Commonwealth v. Espada, 450 Mass. 687, 696-697 (2008), quoting Commonwealth v. Pasteur, 66 Mass. App. Ct. 812, 822 (2006).  That said, "physical contact between a defendant and a victim . . . is not always sufficient to warrant" a sudden combat instruction.  Espada, 450 Mass. at 697, quoting Walden, 380 Mass. at 727.  "This is particularly so when a defendant is armed with a deadly instrument and a victim is not."  Rodriquez, 461 Mass. at 109.  "There must be evidence that would warrant a reasonable doubt that something happened which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, and that what happened actually did produce such a state of mind in the defendant."  Howard, 479 Mass. at 59 n.7, quoting Walden, 380 Mass. at 728.  See Commonwealth v. Curtis, 417 Mass. 619, 629 (1994).  Provocation "must meet both a subjective and an objective standard."  Espada, 450 Mass. at 695, quoting Commonwealth v. Colon, 449 Mass. 207, 220, cert. denied, 552 U.S. 1079 (2007).
            Here, the defendant, armed with a firearm, went to a neighboring house in the middle of the night, where all but two of the occupants were asleep and most of the occupants were children.  None of the occupants was armed.  See Commonwealth v. Ruiz, 442 Mass. 826, 839 (2004) (no sudden combat instruction where victim posed "no threat of serious harm" to defendant). The defendant first came upon Keith, who merely questioned him and attempted to lead him back the way he had entered.  See Commonwealth v. Zukoski, 370 Mass. 23, 28 (1976) ("Insults or quarreling alone cannot provide a reasonable provocation").  The defendant could have left the apartment but instead led Keith to the bathroom and brandished a firearm as he walked around the apartment and looked into a toddler's bedroom.  See Commonwealth v. Tate, 486 Mass. 663, 675-676 (2021) (no sudden combat where defendant was first to brandish firearm not in response to any threat).  The defendant was the first to initiate physical contact when he struck Jessica with the gun.  See Commonwealth v. Randolph, 438 Mass. 290, 301 (2002) (response to violent armed assault on family member "cannot constitute provocation sufficient to mitigate a killing by the intruders"); Curtis, 417 Mass. at 629 (no sudden combat where defendant landed first blow).  He escalated the situation by threatening to use deadly force when he led Jessica at gunpoint to the bathroom where he had corralled Keith and Joseph.  The fact that the defendant was then outnumbered, and Keith and Joseph outweighed him, was a situation of the defendant's own making -- and not one that can be said reasonably to have caught him by surprise.  Contrast Commonwealth v. Vargas, 475 Mass. 338, 365-366 (2016) (evidence of sudden combat where victim was initial aggressor, trained in unarmed combat, and much larger than defendant).  Moreover, in the circumstances here, the difference in weight and height is not persuasive where the defendant was armed, and the victims were not.  Commonwealth v. Ng, 489 Mass. 242, 260 (2022), S.C., 491 Mass. 247 (2023).  Nor could the defendant have reasonably been surprised when Keith attempted to disarm him, given that verbal efforts had failed to dissuade him from leaving the bathroom and going toward the children who were in the rest of the apartment.  See Rodriquez, 461 Mass. at 109 (defendant could not have been surprised that victim would strike back); Commonwealth v. Roderick, 429 Mass. 271, 278-279 (1999) (coming at defendant with machete in response to defendant forcing way into dwelling "cannot be considered legally adequate to provoke the robber into killing his intended victim"); Pasteur, 66 Mass. App. Ct. at 822 (defendants "could scarcely have been surprised when their targets threatened to resist").  
            No view of the evidence entitled the defendant to an instruction on sudden combat.  We recognize that the judge concluded otherwise with respect to murder in the first degree by deliberate premeditation and murder in the second degree.  And the defendant points to the judge's conclusion in this regard to argue that the same conclusion should have been reached with respect to felony-murder.  However, our review of the evidence leads us to conclude that the defendant received the benefit of a sudden combat instruction to which he was not entitled.  See Rodriquez, 461 Mass. at 106.  In any event, he was not entitled to have the instruction repeated with respect to felony-murder.
            2.  Improper appeals to sympathy.  The defendant argues that the prosecutor's repeated references to the children's young ages during opening and closing, references to the adults' status as parents, and use of the nickname "baby Joey" to refer to Joe-Joe were impermissible appeals to the jury's sympathy and emotion.  He contends that the references were unnecessary and went beyond merely providing helpful context, especially since the Commonwealth did not pursue a charge of murder in the first degree based on extreme atrocity or cruelty.  Because the defendant did not object to any of the statements at trial, we review to determine whether the statements were improper and, if so, whether they created a substantial likelihood of a miscarriage of justice.  Commonwealth v. Kapaia, 490 Mass. 787, 794 (2022), citing Commonwealth v. Cheng Sun, 490 Mass. 196, 210 (2022).  "For an error to have created a substantial likelihood of a miscarriage of justice, it must have been likely to have influenced the jury's conclusion."  Kapaia, 490 Mass. at 794, quoting Cheng Sun, 490 Mass. at 210.  We review claims of improper argument "in light of the entire argument, the judge's instructions to the jury, and the evidence actually introduced at trial."  Commonwealth v. Thomas, 429 Mass. 146, 158 (1999).  Additionally, we consider the fact that the defendant did not object to the statements at trial as "some indication that the tone, manner, and substance of the now challenged aspects of the prosecutor's argument were not unfairly prejudicial."  Commonwealth v. Toro, 395 Mass. 354, 360 (1985).  
            a.  Opening statement.  During his opening statement the prosecutor referred to the children in the apartment by using their ages both in addition to, and in lieu of, their names.[6]  The defendant argues that the repeated reference to the ages of the children was designed to inflame the sympathy of the jury.  
            "The proper function of an opening is to outline in a general way the nature of the case which the counsel expects to be able to prove or support by evidence."  Commonwealth v. Alemany, 488 Mass. 499, 511 (2021), quoting Commonwealth v. Hoilett, 430 Mass. 369, 372 (1999).  Here, the prosecutor's opening statement was not improper.  The jury had yet to hear any evidence about events that occurred in an apartment where eight different people were present, most of whom shared the same last name and two of whom shared the same first name.  In these circumstances, using the children's ages was a natural way to help orient the jury to the relationships among the various children and to distinguish among them.  It functioned as a useful epithet to allow the jury to more easily follow the prosecutor's permissible outline of the case.  See Alemany, 488 Mass. at 511 ("A prosecutor may use the opening to set the scene . . . even if that scene is unfavorable to the defendant").  
            b.  Closing argument.  Similarly to his argument with respect to the prosecutor's opening statement, the defendant contends that the prosecutor's references in closing argument to the ages and youthfulness of the children improperly appealed to the jury's sympathy.  As in the opening statement, a number of the prosecutor's references acted as descriptors for the children either in addition to, or in lieu of, their names as a way to distinguish them from each another.[7]  We see nothing improper in those references to the children's ages.  To begin with, as with the opening statement, using the ages of the children helped the jury keep track of the eight people present in the apartment where names standing alone may have been confusing.  In addition, the fact that there were young children present helped explain the adult victims' conduct, in particular that of Keith and Joseph when attempting to prevent the armed defendant from leaving the bathroom to explore the house to find the person he was apparently looking for and who was not in the apartment.  Cf. Commonwealth v. Degro, 432 Mass. 319, 326-327 (2000) (five statements made during closing, including several references to victim's family and age of child, were not improper).  Contrast Commonwealth v. Santiago, 425 Mass. 491, 495 (1997), S.C., 427 Mass. 298 and 428 Mass. 39 (1998) (prosecutor improperly referenced victim's young age and pregnancy during opening statement and closing argument and highlighted her upcoming birthday).  
            Nor do we discern any error in the prosecutor's references to R.C.'s age, which were made to explain R.C.'s perception of events when he was several years younger than when he testified at trial.[8]  "When credibility is an issue before the jury, 'it is certainly proper for counsel to argue from the evidence why a witness should be believed.'"  Commonwealth v. Freeman, 430 Mass. 111, 119 (1999), quoting Commonwealth v. Raymond, 424 Mass. 382, 391 (1997).  The references to R.C.'s age at the time he made the observations to which he testified were thus not improper, particularly given that defense counsel sought to cast doubt on R.C.'s credibility during closing argument.  
            It was also permissible for the prosecutor to direct the jury's attention to the children's ages in order to rebut the defendant's claim that he had been invited to the apartment.[9]  The prosecutor was permitted to respond to defense counsel's suggestion that the defendant had entered the apartment as part of an invited drug transaction by pointing out circumstances that made that scenario implausible.  See Commonwealth v. Dunker, 363 Mass. 792, 800 (1973) ("If he speaks with propriety on matters on the record before the jury, a prosecutor may properly comment on the trial tactics of the defence and on evidence developed or promised by the defence").  See also Commonwealth v. Mason, 485 Mass. 520, 539 (2020) ("A prosecutor is entitled to respond to an argument made by the defense at closing").  
            The defendant also argues that the prosecutor improperly appealed to the jury's sympathy by highlighting that Joseph was Jessica's boyfriend and the father of her children,[10] and the fact that C.C. was R.C.'s "little brother."[1]1  The prosecutor is permitted to "tell the jury something of the person whose life [has] been lost in order to humanize the proceedings" (citation omitted).  Degro, 432 Mass. at 323.  Here, the fleeting references to the individuals' roles as parents, partners, and siblings were not so heavily emphasized as to "risk[] undermining the rationality and thus the integrity of the jury's verdict" (citation omitted).  Commonwealth v. Fernandes, 487 Mass. 770, 791 (2021), cert. denied, 142 S. Ct. 831 (2022).  We see no risk that the prosecutor's statements elicited more sympathy from the jury than what was inherent in the inexplicable murder of two defenseless men in their home while their five children were present.
            Finally, the defendant challenges the prosecutor's use of "Baby Joe" and "Baby Joey" to refer to Joe-Joe.  All of the prosecutor's references to the child as "Baby Joe" or "Baby Joey" occurred only in the context of describing the layout of the house and the specific bedroom occupied by the child, and were not used in an inflammatory manner or otherwise likely to result in an improper appeal to the jury's sympathy.[12]  Contrast Kapaia, 490 Mass. at 795-796 (opening statement was improper appeal to jurors' sympathy where predominant theme of statement involved inflammatory rhetoric describing crime scene, family's memories of victim, and victim's role as boyfriend and father).   
            3.  Sentencing.  The defendant argues that he is entitled to resentencing because the judge prejudged the sentences before the sentencing hearing and because defense counsel failed to present any mitigating information bearing on sentencing.  To understand the bases for these arguments, we begin by summarizing what occurred.
            At the outset of the sentencing hearing, the prosecutor asked for a sidebar conference to discuss certain logistical and other matters.[13]  Once at sidebar, the prosecutor informed the judge of the parties' respective sentencing positions.  Specifically, the prosecutor stated that the Commonwealth wished to have the mandatory life sentences for the two felony-murder convictions run consecutively, with the sentences on the armed home invasion and firearm charge to run concurrently with one of the felony-murder sentences.  The prosecutor informed the judge that he anticipated defense counsel would ask that all sentences run concurrently.
            The prosecutor then summarized the defendant's prior criminal history and identified for the judge the various persons who wished to make impact statements.  
            The discussion then returned to the parties' respective sentencing positions, and the judge asked the prosecutor to explain the significance from the Commonwealth's point of view of having the two life sentences run consecutively rather than concurrently.  After the prosecutor addressed that point by saying that consecutive sentences would value each victim equally, the following exchange ensued:
Defense counsel:  "Obviously, Your Honor, the defense is going to ask the Court to consider that the life sentences be imposed concurrently, and my recommendation is going to be that the defendant be sentenced to [twenty] years, which is the mandatory minimum on the home invasion, and the two life sentences concurrently served with each other and with that sentence.  
"I think the gun is what, a [ten]?"
The prosecutor:  "That's the max, but the minimum is [eighteen] months in the House of Correction, that's all I'm requesting."
Defense counsel:  "Yeah, so I'd ask –- okay.  Then we would have a joint request for the [eighteen] months, but all to run concurrent."
. . . 
"So, as a practical matter, it's the consecutive life sentences that are really the difference between the recommendations as I see it."
 
The judge:  "I'll tell you that I will impose consecutive life sentences.  I'm going to impose – and if there's a joint request, a joint agreement on the gun charge, I will impose that sentence.
"And on the armed home invasion, I am going to sentence [the defendant] to [twenty] to [twenty-five] years in the State Prison to run concurrently.  I'm going to sentence him on that charge for the charge itself and not for the murder charge."
            Defense counsel next argued for a two-week stay of the sentences in order to delay the defendant's transfer from the house of correction, where he had been detained for five years, in order to permit the defendant to "get his property together" and to facilitate visitation with his grandmother, who was arriving from Cambodia.  The judge denied the defendant's motion.  The prosecutor then asked the judge, in light of the number of spectators present in the court room and the emotional nature of the case, to caution the audience against outward displays of emotion.  
            The sidebar discussion then ended, and the judge began the sentencing hearing.  The prosecutor moved for sentencing and asked that the defendant be sentenced to two terms of life imprisonment to run consecutively, with a sentence of from twenty to twenty-five years for the armed home invasion and a sentence of eighteen months in a house of correction, both to run concurrently with the life sentence imposed for Joseph's murder.  The prosecutor then presented several witnesses who made impact statements.  
            After the impact statements, the prosecutor repeated the Commonwealth's sentencing recommendation.  The following exchange then took place:
The judge:  "Thank you.  And that concludes the Commonwealth's presentation, am I correct?"
The prosecutor: "It does, You Honor.  Thank you."
The judge:  "Okay.  [Defense counsel]?"
Defense counsel:  "Defense stands by its earlier recommendation, Your Honor."
The judge then asked the defendant whether he wished to say anything before he was sentenced, and the defendant stated that he did not.  The judge proceeded to sentence the defendant along the lines he had earlier indicated he would during the sidebar conference.  Although defense counsel asked that his objection to the sentences be noted, he raised no other objection.  
            a.  Prejudging sentences.  The defendant now argues that the judge's comments at the sidebar conference show that the judge had prejudged the sentences.  Because the argument was not preserved below, the defendant is entitled to relief only if the alleged error created a substantial likelihood of a miscarriage of justice.  Commonwealth v. Wilson, 486 Mass. 328, 333 (2020).
            When a case has reached the point of sentencing, "judgment has already been rendered; what is at stake at the hearing is the determination as to what consequence the judgment will hold for the defendant."  Commonwealth v. Lykus, 406 Mass. 135, 145 (1989).  Within statutory limits, the "sentencing judge is given great discretion in determining a proper sentence."  Id.  Among other things, the judge may consider whether to impose multiple sentences consecutively or concurrently, G. L. c. 279, § 8, and in some circumstances the decision to impose concurrent sentences may "effectively shorten[] the defendant's term of punishment," Lykus, 406 Mass. at 145.  "Before imposing sentence the [judge] shall afford the defendant or defense counsel an opportunity to speak on behalf of the defendant and to present any information in the mitigation of punishment."  Mass. R. Crim. P. 28 (b), as amended, 489 Mass. 1502 (2022).  The sentencing judge may "consider a wide range of factors in mitigation of the defendant's guilt, including the defendant's behavior, family life, and employment."  Lykus, 406 Mass. at 145.  See Commonwealth v. Plasse, 481 Mass. 199, 205 (2019).
            Here, the judge's sentencing discretion was in several respects limited by the applicable statutory minimums.  The two felony-murder convictions carried mandatory life sentences without the possibility of parole.  G. L. c. 265, § 2 (a).  The defendant's conviction of armed home invasion carried a mandatory minimum sentence of twenty years in State prison.  G. L. c. 265, § 18C.  And the firearm conviction carried a mandatory eighteen-month sentence to be served in a house of correction.  G. L. c. 269, § 10 (a) (6).  Ultimately, the judge imposed the statutory minimum sentences in all respects save for the armed home invasion conviction, where he deviated upward only minimally from the mandatory minimum.  Moreover, the judge imposed the non-life sentences concurrently with one of the felony-murder convictions.  Although it is true that the judge imposed the felony-murder sentences consecutively rather than concurrently, the defendant has failed to identify any practical effect from that decision given that, either way, the defendant would be required to spend his lifetime in prison without the possibility of parole.
            Nonetheless, the defendant argues that he is entitled to resentencing because the judge's comments during the sidebar conference show that the judge "may have decided to lower the boom before defense counsel could address any mitigating factors."  Commonwealth v. Lewis, 41 Mass. App. Ct. 910, 911 (1996).  Although the judge did preview his sentencing views during the sidebar conference, he did not do so before hearing defense counsel's recommendations and the reasons for them.  In addition, during the sentencing hearing itself, the judge gave both defense counsel and the defendant an opportunity to present any mitigating information.  The fact that the judge's ultimate sentences at the conclusion of the sentencing hearing mirrored the ones he had previewed during the sidebar conference is not, standing alone, sufficient to show that the judge had prejudged the matter.  The judge conducted a full and fair sentencing hearing with an opportunity for both sides to be heard before imposing the sentences.  Cf. Commonwealth v. Coleman, 390 Mass. 797, 801-802 (1984) (no substantial risk of miscarriage of justice where trial judge remarked that he "made [his] findings [in the case] the minute . . . [the victim] took the stand").  
            b.  Ineffective assistance of counsel.  The defendant also argues that he was deprived of the effective assistance of counsel when defense counsel failed to present any mitigating circumstances at sentencing.  More specifically, the defendant points to the fact that defense counsel failed to present information known to him concerning the fact that the defendant (a) was the father of three children, (b) was the son of immigrants, (c) grew up in difficult circumstances in Providence, Rhode Island, in a neighborhood where there were gangs, (d) was involved in a car accident during his teenage years after which his decision-making reportedly got worse, and (e) was a "full-blown alcoholic."[14]  While the defendant acknowledges that counsel did, in fact, advocate that all the sentences run concurrently, he contends that the judge's decision to impose the life sentences consecutively would have been meaningfully impacted had defense counsel presented these mitigating circumstances.  Contrast Lykus, 406 Mass. at 146 (defense counsel did not request imposition of concurrent sentences).
            A claim of ineffective assistance of counsel is presented in its weakest form where, as here, it was not first raised in a motion for a new trial supported by an affidavit from trial counsel.  Commonwealth v. Brown, 462 Mass. 620, 629 (2012).  This is because the claim is made "bereft of any explanation by trial counsel for his actions and [is] suggestive of strategy contrived by a defendant viewing the case with hindsight."  Commonwealth v. Diaz, 448 Mass. 286, 289 (2007), quoting Commonwealth v. Peloquin, 437 Mass. 204, 210 n.5 (2002).  "In evaluating a claim of ineffective assistance of counsel in a case of murder in the first degree, we begin by determining whether there was a serious failure by trial counsel."  Commonwealth v. Harbin, 435 Mass. 654, 656 (2002).  Serious failure of counsel means "serious incompetency, inefficiency, or inattention of counsel -- behavior falling measurably below that which might be expected from an ordinary, fallible lawyer."  Commonwealth v. Shuman, 445 Mass. 268, 276 (2005), quoting Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).  If we find such a failure, then we then must determine, in accordance with G. L. c. 278, § 33E, whether counsel's failure gives rise to a substantial likelihood of a miscarriage of justice, i.e., whether it was "likely to have influenced the [decision maker's] conclusion."  Commonwealth v. Mitchell, 428 Mass. 852, 854 (1999), quoting Commonwealth v. Hardy, 426 Mass. 725, 730 (1998).
            The better course here would have been for defense counsel to have brought to the judge's attention any mitigating circumstances bearing on sentencing.  However, given the circumstances, no substantial likelihood of a miscarriage of justice resulted from his failure to do so.  Given the strength of the Commonwealth's case, the nature and the circumstances of the crimes, the defendant's criminal history, and the multiple homicide victims, we are confident that the defendant's relatively weak mitigating circumstances would have been overshadowed.  See Commonwealth v. Wilson, 443 Mass. 122, 140 (2004).  We discern little to no possibility that the judge would have imposed concurrent life sentences rather than consecutive ones had defense counsel introduced the mitigating information to which the defendant now points.  See Commonwealth v. Montrond, 477 Mass. 127, 135-136 (2017) (although omitted evidence "could have been somewhat helpful" and should have been introduced, there was no substantial likelihood of miscarriage of justice where it would not have altered outcome).  And, in any event, we discern no prejudice given the lack of any practical difference to the defendant from having the life sentences run consecutively rather than concurrently.  
            4.  Review under G. L. c. 278, § 33E.  Finally, the defendant asks that we exercise our extraordinary power under G. L. c. 278, § 33E, to reduce the felony-murder convictions to manslaughter or to murder in the second degree.  He points to the same mitigating circumstances we have identified above, argues that there is no "definitive evidence as to what happened in the apartment on the night of the killing[s]," contends that the verdicts are against the weight of the evidence, and points to his and Keith's intoxication on the night of the crimes.  The defendant further points to the fact that there was "nothing to suggest there was any ill will between the defendant and the victims, or to suggest any motive for the killings."  
            After considering the defendant's arguments and carefully reviewing the entire record, we see no reason to disturb the jury's verdicts.  This is not a case where the convictions appear out of proportion to the defendant's culpability.  See Commonwealth v. Rolon, 438 Mass. 808, 824 (2003) ("the doctrines of felony-murder and joint venture may, on some hypothetical fact patterns, produce a conviction of murder in the first degree that would appear out of proportion to a defendant's culpability").  In addition, we have carefully reviewed the transcript and evidence to evaluate defense counsel's argument to the jury that the gun discharged by accident.  Because the defendant did not testify, there was no direct evidence to support this hypothesis.  Nor did the circumstantial evidence support it either.  We note, in particular, the gap in time between the two shots that killed Keith and the third which killed Joseph.  In addition, the Commonwealth's ballistics expert testified that the gun had to be racked before it was initially fired, and that the gun required more than a normal amount of pressure on the trigger in order to fire.  
            Conclusion.  We affirm the defendant's convictions of felony-murder in the first degree.  We vacate and set aside the defendant's conviction of armed home invasion.  We also vacate the defendant's conviction of unlawful possession of a firearm and remand that charge for further proceedings consistent with this opinion.           
So ordered. 
 
footnotes

 
            [1] The defendant was tried in 2019.  Because the defendant's appeal was pending when New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022), was decided, he is entitled to "the right to have the Commonwealth prove that he lacked a license."  Commonwealth v. Guardado, 493 Mass. 1, 12 (2023), cert. denied, 144 S. Ct. 2683 (2024).
            [2] As they share a surname, we refer to Keith and Joseph Callahan by their first names.
            [3] To prove the life felony of armed home invasion, the Commonwealth was required to prove beyond a reasonable doubt  
"that the defendant (1) knowingly entered the dwelling place of another; (2) knowing or having reason to know that one or more persons were present therein, or, having entered without such knowledge, remained in the dwelling place after acquiring or having reason to have acquired such knowledge; (3) while armed with a dangerous weapon; and (4) used force or threatened the imminent use of force upon any person within such dwelling place, whether or not injury occurred, or intentionally caused injury to any person within such dwelling place." 
Commonwealth v. Brown, 451 Mass. 200, 205 (2008), citing Commonwealth v. Doucette, 430 Mass. 461, 465–466 (1999).
            [4] Because Joseph and his thirteen month old son share the same name, we refer to the son by the nickname Joe-Joe used by the witnesses at trial.  For convenience, we also refer to Jessica Kelly by her first name.
            [5] Joseph was approximately five feet, eight inches tall and 198 pounds.  Keith was five feet, eleven inches tall and 263 pounds.  The defendant was described by Jessica as a skinny "little pipsqueak."
            [6] The prosecutor made the following statements with respect to Jessica's children:  "She was living there with her boyfriend and her two small children.  She had a [thirteen]-month-old named Joey and a six-week-old child . . ."; "Her six-month-old – her six-week-old child . . . was sleeping in a bassinet in the same room"; "In the adjoining room, her [thirteen]-month-old child, Joey, Jr., was in a crib"; "She ran into her bedroom where her six-week-old child was in the bassinet, she picked him up."  
            The prosecutor also referred to the ages of R.C. (who was anticipated to testify at trial and, in fact, did so) and his younger brother C.C.:  "[R.C.] was eleven years old at the time"; "He didn't see his dad, but he saw the Asian man that had been standing just a few feet away from him.  He was holding a gun in his hand.  He was down looking into the [thirteen]-month-old baby's bedroom, which is just a few feet away from Jessica Kelly's bedroom"; "He then went back into his dad's bedroom where his younger brother, [C.C.], who was six years old, was sleeping on his dad's bed, and woke him, signaling to say nothing by putting a finger over his mouth"; "He then signaled to the closet and he took his six-year-old brother into the closet in Keith's bedroom"; "And while those two little boys were sitting in that closet, [R.C.] will tell you that he heard what he thought was fighting going on in the bathroom, and then he heard two shots back to back, they were very loud."  
            The prosecutor also alluded to statements made by Keith and Joseph in the bathroom that referenced the children in the apartment:  "They pleaded with him, 'No, no.  We've got young children in the house,' but he was having none of it."  
            [7] The prosecutor made the following references to the children's ages in the closing:  "He got up and went into the bedroom and sat down next to his dad where his younger brother, [C.C.], who was six years old at the time, was sleeping"; "Now, when [Jessica] first entered that room, she told that as she's running into that room, she heard the first shot, and then she heard another shot that woke the baby, but then she grabbed him and took them into the closet"; "They had young kids in the house.  They had an [eleven]-year-old, a [six]-year-old, a [thirteen]-month-old, and a [six]-week-old baby in that house."
            [8] The prosecutor made the following references to R.C.'s age in the closing:  "[R.C.] was eleven years old at the time"; "He was standing in front of Keith, but he's not looking at Keith, he's looking around, and when he looked in his direction, he got scared, he was eleven years old"; "The [sixteen]-year-old boy who testified before you, how did he say his father looked?"
            [9] The prosecutor stated in the closing:  "And why would Keith and Joseph Callahan have invited a drug dealer into their house at 2:30 in the morning while young children were all over the place sleeping?" and "Why would Keith Callahan then have a conversation with this guy in front of his door with his child, his eleven-year-old child, in the next room if he was there to do a drug deal?"
            [10] The prosecutor stated in reference to Jessica:  "When she entered that bathroom, she saw Keith Callahan and her boyfriend and the father of her children, Joseph Callahan, standing in that bathroom"; "When she comes out, she goes to the bathroom and she sees Keith lying near the door, he's on the ground and he's bleeding badly, and then she sees Joseph, her boyfriend, next to the wall of the bathroom, and he's bleeding badly, as well"; "[The defendant] entered someone else's house with a gun, a loaded gun, a cocked loaded gun, and he pointed it at people.  He pointed it at the mother of Joseph Callahan's kids."
            [11] The prosecutor stated:  "When he saw the Asian man looking into that room with a gun in his hand, [R.C.] went back over to the bed and got his little brother [C.C.] up, signaling to him, shhh"; "If [R.C.] had not seen a man with a gun, there would be no reason for him to wake his little brother up and hide in a closet."
            [12] Specifically, the prosecutor stated:  "You all were in that room and each of you looked at that angle, down the hallway, toward the kitchen and toward the room that had been described as Baby Joey's room, and that is where [R.C.] said he looked"; "And where was he standing?  He was standing in front of Baby Joe's room.  And what did he have in his hand, a black gun"; "This is the view [R.C.] had when he looked down that hallway.  The room to the right is Baby Joey's room"; "You can see to the left is Baby Joey's room, and to the right is Jessica's room"; "When [R.C.] first looked down, he saw Dara – the Asian man, standing in front of Baby Joey's room with a gun in his hand"; "And I'm showing you Exhibit 18 where she took her baby, her six-week-old baby out of that basinet, and then she ran back out into the kitchen and into Baby Joey's room"; "Once inside Baby Joey's room, she grabbed him from out of that crib." 
            [13] The sentencing hearing took place nine days after the conclusion of the trial.  
            [14] Trial counsel had presented this information previously to a different judge (not the trial judge) who had handled an earlier event in the case.